## Appeal of KENTUCKY LAND, GAS & OIL CO.

Docket No. 1473.    Submitted May 7, 1925.    Decided October 12, 1925.

Where lots were sold under a contract which provided that an oil well would be drilled when a certain number of lots had been sold, the cost of drilling such well is an additional cost of the property, and the gain derived from such sales is the difference between the selling price and the cost of the lots sold plus such additional cost.

H. C. Sherritt, Esq., and Robert J. Walker, C. P. A., for the taxpayer.

Lee I. Park, Esq., for the Commissioner.

Before MARQUETTE, LANSDON, and GREEN.

FINDINGS OF FACT.

The taxpayer is a corporation organized under the laws of Virginia on June 9, 1916. During the year 1916 the taxpayer acquired a tract of oil land in Carter County, Ky., consisting of 197½ acres, which it subdivided into lots 20 feet by 40 feet each. The corporation proceeded to dispose of the lots through J. B. Stone, Inc., its sales agent, at $20 and $25 per lot, and one-half of the sale price was paid to the sales agent as commission. J. B. Stone was president of the taxpayer and of J. B. Stone, Inc., The taxpayer, through its agent, made representations to purchasers and prospective purchasers that the funds received through the sale of lots would be used in the drilling of wells. Approximately one-fourth of the lots were sold during 1919 and not more than one-half of the lots were ever sold. The conveyance to each purchaser contained, among others, the following covenant:

That the " Company " will drill four (4) wells for oil or gas on the sub-division, shown by said Plat, the location to be selected by some practical engineer chosen by the " Company "; that the first well will be commenced at such time as twenty-five per cent. of the lots in the said entire sub-division are sold and paid for; that a second well will be commenced when fifty per cent., and a third well when seventy-five per cent. of the lots are sold and paid for, and a fourth well when the balance of the lots in the entire sub-division are sold and paid for, all wells so commenced to be drilled to completion.

The " Company " covenants and agrees that the income derived by it from the sale of oil or gas, from any well so drilled by the " Company " on the sub-division, shall be used, first, for the drilling of additional wells, as the " Company " may deem best for the interest of the lot owners in said sub-division and the operation of all wells drilled; second, the residue shall be divided as follows: one-fourth shall be retained by the " Company ", and the remaining three-fourths shall be deposited in the Seaboard National Bank, of Norfolk, Va., and the checks to be issued every three months to the lot owners for their proportionate part of the profits on all oil and gas taken from well sunk by said " Company ", said lot owners to be recognized according to records of Company.

It is understood and agreed as part of the consideration of this deed that the " Company " hereby reserves unto itself, the oil, gas and mineral rights in all of said lots for the purpose of drilling the well as above set forth and unrestricted; this reservation, however, to be of no effect and void, in case the " Company " shall fail to find gas or oil in the four wells to be drilled in the manner aforesaid.

In 1918 the taxpayer purchased a drilling outfit and contracted for the drilling of oil wells on the property above described. Actual

drilling commenced during 1919 and between that time and 1922 four wells were completed, none of which produced oil or gas in paying quantities. In 1923 the assets of the taxpayer, with the exception of the unsold lots, were disposed of, and, after paying the known liabilities, the balance was distributed among the stockholders.

The Commissioner determined that the gain derived from the sale of the lots in 1919 was income to the taxpayer and subject to tax in that year, and declined to allow the cost of drilling wells in determining the amount of gain from such sales.

### DECISION.

The determination of the Commissioner is approved in part, and the deficiency should be computed in accordance with the following opinion. Final settlement will be made on consent or on 10 days' notice, under Rule 50.

### OPINION.

MARQUETTE: The taxpayer claims that by reason of the representations made to purchasers that the amounts derived from the sale of lots would be used in drilling wells, they became trust funds in its hands which were dedicated to the development of its property, and which it was compelled to expend for that purpose, and that no part thereof constituted income within the meaning of the law. On the other hand, the Commissioner contends that the company was under no obligation to drill the wells, and that if it was under such obligation the drilling of the wells was a separate and distinct transaction from the sale of the lots. We are unable to agree with either position. Whatever representations were made by the taxpayer to purchasers of lots, the contract of the taxpayer was contained in the covenants in the deeds, and prior agreements must be considered as merged therein. The taxpayer's obligation was to drill four wells on the subdivision; the first well to be commenced when 25 per cent of the lots were sold and paid for; the second well when 50 per cent were sold; the third well when 75 per cent were sold; and the fourth well when the balance of the lots were sold. During the year in question but 25 per cent of the lots were sold, and the taxpayer, under its covenants, was bound to drill but one well. The cost of drilling this well is therefore an additional cost of the property and a proper charge against the sale price of the lots sold during 1919 before determining the gain derived from the sale thereof. The gain to the taxpayer is the difference between the selling price of the lots and the cost thereof plus the cost of the well.