111 T.C. No. 5


UNITED STATES TAX COURT


NORWEST CORPORATION AND SUBSIDIARIES, SUCCESSOR IN INTEREST TO
UNITED BANKS OF COLORADO, INC., AND SUBSIDIARIES, ET AL.,[1]
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 26499-93, 3723-95,          Filed August 10, 1998.
            3724-95, 3725-95.


I.

    P is the successor in interest to an affiliated
group of corporations whose parent corporation is
United Banks of Colorado, Inc. (the UBC affiliated
group and UBC, respectively).  UBC and certain other
members of the UBC affiliated group (collectively, the
Bank) built a structure called the Atrium.  P seeks to
allocate the cost of constructing the Atrium to the
bases of adjoining properties that were held by the
Bank.  Alternatively, P seeks to deduct the cost of

[1]     The cases of the following petitioners are consolidated
herewith:  Norwest Corp., Successor in Interest to United Banks
of Colorado, Inc., and Subs., docket No. 3723-95; Norwest Corp.,
Successor in Interest to Intrawest Financial Corp. and Subs.,
docket No. 3724-95; Norwest Corp., Successor in Interest to Lorin
Investment Co., Inc. and Subs., docket No. 3725-95.

constructing the Atrium under sec. 165(a), I.R.C.
Held:  P may not allocate the cost of constructing the
Atrium to the bases of the adjoining properties because
the basic purpose of the Atrium was not the enhancement
of the adjoining properties so as to induce sales of
those properties.  The basic purpose test enunciated in
Estate of Collins v. Commissioner, 31 T.C. 238 (1958),
and subsequent cases, is applicable, but the Atrium
does not qualify under that test.  Held, further, P has
failed to establish a loss equal to the cost of
constructing the Atrium pursuant to sec. 1.165-1(b) and
(d)(1), Income Tax Regs., and, therefore, is not
entitled to a deduction under sec. 165(a), I.R.C.

## II.

Pursuant to various agreements (the 1988 Atrium
Transaction), a member of the UBC affiliated group
(LBC) sold an undivided 48-percent interest in the
Atrium and certain related property, and another member
of the UBC affiliated group (UBD) agreed to lease the
Atrium and certain related property from LBC and
another party.  The UBC affiliated group reported the
1988 Atrium Transaction as a sale and leaseback for
Federal income tax purposes.  Held:  P may not disavow
the form of the 1988 Atrium Transaction.

## III.

P claims that it is entitled to calculate the
corporate minimum tax for the UBC affiliated group's
1977, 1980, 1984, and 1985 taxable years on a separate
return basis and claims refunds for those years on that
basis.  Held:  The regular tax deduction under sec.
56(c), I.R.C., for an affiliated group of corporations
is limited to the amount of tax imposed on the group
under chapter one of subtitle A (without regard to the
corporate minimum tax and certain other provisions and
reduced by the sum of certain credits) and, therefore,
P's refund claim is denied.

## IV.

P claims that certain furniture and fixtures
placed in service by various members of the UBC
affiliated group during the group's 1987 through 1989
taxable years, which are described in both asset
guideline classes 57.0 (Distributive Trades and
Services) and 00.11 (Office Furniture, Fixtures, and

Equipment) of Rev. Proc. 87-56, 1987-2 C.B. 674, should be classified as class 57.0 property. Held: Rev. Proc. 87-56 carries forward the pattern established in Rev. Proc. 62-21, 1962-2 C.B. 418; the priority rule of Rev. Proc. 62-21 is implicit in Rev. Proc. 87-56: Asset guideline class 00.11 takes precedence over asset guideline class 57.0.

V.

P claims that, in determining the portion of the UBC affiliated group's consolidated net operating loss (NOL) that is attributable to bad debt deductions of bank members, and is, thus, subject to the special 10-year carryback rule of sec. 172(b)(1)(L), I.R.C., it can apply the special loss ordering rule of sec. 172(l)(1), I.R.C., to the consolidated NOL of both bank and nonbank members. Held: The consolidated return regulations contemplate that the consolidated NOL is comprised of the separate taxable income, including separate NOL, of each member, and the special ordering rules of sec. 172(l)(1), I.R.C., apply to a bank not between a bank member and a nonbank member of an affiliated group.

Walter A. Pickhardt, Mark Hager, and Scott G. Husaby for petitioners.

Jack Forsberg, Tracy Martinez, Robert M. Ratchford, and David L. Zoss, for respondent.

OPINION

HALPERN, Judge: Norwest Corp. (Norwest), a Delaware corporation, is the petitioner in each of these consolidated cases. Norwest is the petitioner by virtue of being the successor in interest to various other corporations. When necessary for clarity, we shall refer by name to Norwest or one or the other of those predecessor corporations. Otherwise, we

shall use the term "petitioner" to refer without distinction to Norwest or one or more of the predecessor corporations.

These consolidated cases involve determinations by respondent of deficiencies in petitioner's Federal income taxes and claims by petitioner of overpayments, as follows:

|  | Norwest Corp. & Subs., Successor in Interest |  |
| Docket No. 26499-93 | to United Banks of Colorado Inc., & Subs. |  |

| Taxable Year Ending | Deficiency | Overpayment |
| --- | --- | --- |
| Dec. 31, 1988 | $1,375,108 | $1,655,377 |
| Dec. 31, 1989 | 1,220,465 | 1,073,562 |
| Dec. 31, 1990 | 11,709 | 641,481 |
| Apr. 19, 1991 | 20,390 | 200,417 |

|  | Norwest Corp., Successor in Interest to |  |
| Docket No. 3723-95 | United Banks of Colorado, Inc., and Subs. |  |

| Taxable Year Ending | Deficiency | Overpayment |
| --- | --- | --- |
| Dec. 31, 1977 | $169,807 | $2,266,944 |
| Dec. 31, 1978 | 390,485 | 3,625,304 |
| Dec. 31, 1979 | 123,996 | 5,931,559 |
| Dec. 31, 1980 | 2,778 | 467,598 |
| Dec. 31, 1984 | 648,163 | 3,374,964 |
| Dec. 31, 1985 | 4,637,602 | 1,596,738 |

|  | Norwest Corp., Successor in Interest to |
| Docket No. 3724-95 | Intrawest Financial Corp. and Subs. |

| Taxable Year Ending | Deficiency |
| --- | --- |
| Dec. 31, 1980 | $34,413 |
| Apr. 30, 1987 | 1,010 |

|  | Norwest Corp., Successor in Interest in |
| Docket No. 3725-95 | Lorin Investment Co., Inc., and Subs. |

| Taxable Year Ending | Deficiency |
| --- | --- |
| Dec. 31, 1980 | $20,491 |
| Dec. 31, 1981 | 10,371 |

After concessions by the parties, the issues remaining for decision are (1) whether petitioner may allocate the cost of certain property to the bases of other properties, (2) whether petitioner is entitled to a loss deduction under section 165(a) for the cost of certain property, (3) whether petitioner may disavow the form of a transaction relating to certain property, (4) whether petitioner is entitled to refunds of tax paid pursuant to section 56(a), (5) the applicable recovery period for determining depreciation deductions with respect to certain furniture and fixtures, and (6) the appropriate method for determining that portion of a consolidated net operating loss attributable to the bad debt deductions of the bank members of an affiliated group. Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties, with accompanying exhibits, are incorporated herein by this reference. The parties have made 150 separate stipulations of fact, occupying more than 40 pages, and there are 174 accompanying exhibits. We shall set forth only those stipulated facts that are necessary to understand our report, along with other facts that we find.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

CONTENTS

I.  Background ......................................7
II. Atrium Issues...................................8
    A.  Findings of Fact............................8
        1.  Background.............................8
        2.  Events Preceding the 1981 Transactions. ..........11
            a.  Introduction...............................11
            b.  The Committee Meeting of August 24, 1979....12
            c.  The Harrison Price Report..................13
            d.  The Planning Dynamics Report...............14
            e.  The Committee Meeting of August 25, 1980....15
            f.  Approval of the Facilities Master Plan......16
        3.  The 1981 Transactions............................16
            a.  The 1700 Partnership.......................16
            b.  The Ground Lease...........................16
            c.  The Atrium Project Agreement...............17
            d.  The Skyway Agreement, the 1981 Easement
                Agreement, and the Space Lease.............18
        4.  The Ross and Eastdil Reports....................19
        5.  The Committee Meeting of October 24, 1984.......22
        6.  Construction and Operation of the Atrium........22
        7.  The Atrium Assets: Cost Bases and Depreciation...24
        8.  The 2UBC Transaction............................26
            a.  The Various Agreements......................26
            b.  Tax Treatment of the 2UBC Transaction.......27
        9.  The 3UBC Transaction............................28
            a.  The Various Agreements......................28
            b.  Tax Treatment of the 3UBC Transaction.......30
        10. The 1UBC Land Transaction........................30
        11. The 1988 Atrium Transaction.....................31
            a.  Background.................................31
            b.  The Atrium Sale Agreement...................31
            c.  Tax Treatment by UBC of the
                1988 Atrium Transaction....................33
            d.  UBC's Financial Statements.................34
            e.  Petitioner's Responses to Information
                Document Requests Regarding the Atrium......34
    B.  The Atrium Assets: Allocation of the Costs...........35
        1.  Issue.........................................35
        2.  Arguments of the Parties........................36
        3.  Analysis........................................38
            a.  Developer Line of Cases.....................38
            b.  The Principles of the Developer
                Line of Cases..............................42
            c.  Application of the Basic Purpose Test........44
        4.  Conclusion.......................................49

C.  The Atrium Assets: Loss Deduction
    Under Section 165(a)....................................51
D.  The 1988 Atrium Transaction: Disavowal of Form.......52
    1.  Issue.........................................52
    2.  Arguments of the Parties......................52
    3.  Analysis......................................53
        a.  Introduction.............................53
        b.  The Danielson Rule Does Not Apply.........54
        c.  Respondent's Weinert Rule.................55
        d.  Estate of Durkin v. Commissioner..........58
        e.  Petitioner May Not Disavow the Form of the
            1988 Atrium Transaction...................59
    4.  Conclusion....................................62

III. Corporate Minimum Tax Issue...............................62
    A.  Introduction.....................................62
    B.  The Corporate Minimum Tax Provisions.............63
    C.  The Two Methods.................................64
        1.  UBC's Method..............................64
        2.  Petitioner's Method.......................64
    D.  Analysis........................................67
        1.  Issue.....................................67
        2.  Arguments of the Parties..................67
        3.  Discussion................................69
    E.  Conclusion......................................75
IV. Furniture and Fixtures Recovery Period Issue.............75
    A.  Introduction....................................75
    B.  Applicable Recovery Period; Class Life..........78
    C.  Arguments of the Parties........................80
    D.  Discussion......................................81
    E.  Conclusion......................................87
V.  Net Operating Loss Issue...............................87
    A.  Introduction....................................87
    B.  Facts...........................................89
    C.  Petitioner's Position..........................93
    D.  Discussion......................................94
    E.  Conclusion......................................97

I.  Background

On the date that the petition in each of these cases was filed, Norwest's principal place of business was in Minneapolis, Minnesota. Norwest is a bank holding company whose affiliates provide banking and other financial services.

On April 19, 1991, United Banks of Colorado, Inc. (UBC), a Colorado corporation, was merged with and into Norwest pursuant to section 368(a)(1)(A). At all relevant times prior to its merger with Norwest, UBC was the common parent corporation of an affiliated group of corporations making a consolidated return of income (the UBC affiliated group). UBC was a calendar-year taxpayer. Petitioner is the successor in interest to the UBC affiliated group as it existed during the years in issue.

On May 1, 1987, Intrawest Financial Corp. (Intrawest), a Colorado corporation, was merged with and into UBC pursuant to section 368(a)(1)(A). At all relevant times prior to its merger with UBC, Intrawest was the common parent corporation of an affiliated group of corporations making a consolidated return of income (the Intrawest affiliated group). Petitioner is the successor in interest to the Intrawest affiliated group for its taxable year 1980 and its short taxable year ended April 30, 1987.

On April 1, 1982, UBC purchased for cash the stock of Lorin Investment Co., Inc. (Lorin), a Colorado corporation. At all relevant times prior to being acquired by UBC, Lorin was the common parent corporation of an affiliated group of corporations making a consolidated return of income (the Lorin affiliated group). Petitioner is the successor in interest to the Lorin consolidated group for its taxable years 1980 and 1981.

II.  Atrium Issues

    A.  Findings of Fact

        1.  Background

During the years in issue, UBC owned in excess of 99 percent of the stock of United Bank of Denver (UBD), a national bank with its principal place of business in Denver, Colorado.  UBD was the sole shareholder of Lincoln Building Corp. (LBC), a Colorado corporation.  LBC was the real estate holding company for UBD. (In the papers filed in this case, the convention of the parties has been to use the term "the Bank" to refer to UBC, UBD, or LBC, individually or collectively, in cases where those corporations acted in concert or where separate identification would not be material.  We shall adopt that convention.)

During the 1970s, LBC owned a portion of a block in downtown Denver, Colorado, which is bounded by 17th Avenue to the south, by 18th Avenue to the north, by Broadway to the west, and by Lincoln Street to the east (the Broadway-Lincoln block).  During the 1970s and throughout some of the years in issue, LBC owned two buildings located on the Broadway-Lincoln block, namely, Two United Bank Center Building, located at 1700 Broadway (2UBC) and Three United Bank Center Building, located at 1740 Broadway (3UBC).  A sketch of the Broadway-Lincoln block, the two buildings, and certain other features is attached hereto as an appendix.

2UBC is a 22-story office building, which was constructed in 1954 and has approximately 390,000 square feet of rentable space. 2UBC is considered a notable building in Denver because it was the first modern highrise built in the city and was the first highrise designed by I.M. Pei.  3UBC is a four-story office building, which was constructed in 1958 and has approximately 115,000 square feet of rentable space.  Throughout the 1970s, 2UBC was primarily leased to non-Bank tenants, and 3UBC was wholly occupied by the Bank.  3UBC served as the Bank's headquarters prior to completion in 1983 of One United Bank Center Building (1UBC).  See infra sec. II.A.3.b.

During the 1970s, LBC also owned land on the Broadway-Lincoln block between 2UBC and 3UBC and east of 2UBC extending to Lincoln Street.  There were improvements on that land constituting an enclosed courtyard.  On the corner of Lincoln Street and 17th Avenue of the Broadway-Lincoln block were a glass-enclosed restaurant and a small office building, both of which were owned by LBC.

During the 1970s, LBC owned a portion of a block in downtown Denver, Colorado, that is bounded by 17th Avenue to the south, by 18th Avenue to the north, by Lincoln Street to the west, and by Sherman Street to the east (the Lincoln-Sherman block).  That block is directly to the east of and across Lincoln Street from the Broadway-Lincoln block.  During the 1970s and throughout some

of the years in issue, LBC owned land and improvements on the Lincoln-Sherman block directly across from 3UBC, including a structure named Motorbank I. That structure consisted of three underground levels, two of which contained office space and one of which contained mechanicals, a ground level that contained office space, and 10 floors of above-ground parking space. Motorbank I had approximately 1,000 square feet of office space and approximately 103,000 square feet of parking space. 3UBC was connected to the Motorbank I parking garage by an elevated, enclosed pedestrian walkway and was connected to the Motorbank I office space by a passage under Lincoln Street. Motorbank I also had facilities to accommodate drive-up banking through about 1987.

During the 1970s, LBC owned a portion of a block in downtown Denver, Colorado, that is bounded by 17th Avenue to the south, by 18th Avenue to the north, by Sherman Street to the west, and Grant Street to the east (the Sherman-Grant block). That block is directly to the east of and across Sherman Street from the Lincoln-Sherman block. In the late 1970s, LBC purchased property on the Sherman-Grant block.

2. Events Preceding the 1981 Transactions

a. Introduction

In the late 1970s, the Bank was in need of additional office space and was planning the development of a new office tower.

Unable to acquire a site on Broadway (the intersection of Broadway and 17th Avenue, where 2UBC was located, was considered the "100 percent corner" in the central business district of Denver), the Bank decided to pursue the development of an office tower on the Lincoln-Sherman block. At that time, the Lincoln-Sherman block was on the fringe of the central business district and was considered to be a substantially less preferable location than the Broadway-Lincoln block. In the late 1970s, LBC acquired land on the Lincoln-Sherman block adjacent to Motorbank I and fronting on the corner of Lincoln Street and 17th Avenue in contemplation of the construction of a new headquarters building on the site.

The Board of Directors of UBD had a working committee called the Directors' Facility Planning Committee (the Committee), which initiated or approved all major decisions regarding the Bank's real estate holdings. The Committee was closely involved in the planning of the new office tower project (the Project).

In the late 1970s, Planning Dynamics Corp. (Planning Dynamics), was retained by the Bank as a consultant for the Project and was closely involved in the Project through 1986.

In 1979, the Gerald D. Hines Interests (the Developer) was selected by the Bank as the developer for the Project.

In 1979, the Bank and the Developer selected the firm of Johnson-Burgee (the Architects) to be the architects for the Project.

b.  <u>The Committee Meeting of August 24, 1979</u>

Architectural plans for the Project prepared by the
Architects were presented to the Committee on August 24, 1979.
The Architects proposed that a glass atrium be constructed on the
Broadway-Lincoln block enclosing the area between 2UBC and 3UBC
(and east of 2UBC) and that the atrium be connected to the new
office tower on the Lincoln-Sherman block by an elevated,
enclosed pedestrian walkway across Lincoln Street.  The minutes
of the Committee meeting on August 24, 1979, in part, provide:

> Mr. Hershner presented an architectural scale
> model of the project as designed by Philip Johnson &
> John Burgee for review by the Committee, and explained
> the impact to the existing bank block.  The
> architectural scheme as shown resolves two major design
> issues:  how to tie the new tower to 17th Avenue and
> Broadway and how to achieve identity of the new tower
> and existing bank facilities as a "center" even though
> the properties are separated by Lincoln Street.
>
> The solution proposed by Johnson/Burgee shows a
> strong skyline identity and unique visual image created
> by the curvilinear roof line of the new tower.
>
> Identity of the project as a "center" from a
> pedestrian scale at the street level is achieved by the
> skylight enclosure bridging Lincoln Street, then
> wrapping around the existing Tower Building and
> connecting with the Main Bank.
>
> Circulation patterns to the new tower through the
> proposed enclosed mall in the existing bank block
> effectively places the "front door" of the new tower on
> 17th and Broadway.  * * *

c.  <u>The Harrison Price Report</u>

In 1980, the Bank retained the Harrison Price Co. (Harrison
Price) as an outside consultant to address a number of issues

regarding the Project, including whether the proposed atrium should remain a part of the Project.  Harrison Price prepared a report dated August 20, 1980, entitled "Economic Contribution of the Glass Pavilion to the United Bank of Denver", setting forth its opinion regarding the proposed atrium (the Harrison Price Report).  The Harrison Price Report assumed that the proposed atrium would cost $16 million and estimated that it would generate a net operating deficit of $100,000 a year, based on revenues and operating expenses of $500,000 and $600,000, respectively.  The Harrison Price Report concluded that the proposed atrium "is a rational and constructive commitment which will return a positive benefit to the stockholders" of the Bank.  That opinion was based on three factors:  (1) the proposed atrium would increase the rental rates for 2UBC and 3UBC to generate a value addition of $9 million, (2) the proposed atrium "provides a means to counteract any adverse perception of Number 1 United Bank Center associated with an off-Broadway location", and (3) the proposed atrium "will in all liklihood [sic] add power, presence, and image to the Bank's operation which will be reflected in greater market share."

      d.   The Planning Dynamics Report

In a letter dated August 25, 1980, Richard R. Holtz, president of Planning Dynamics, addressed the economics, aesthetics, and functionality of the proposed atrium (the

Planning Dynamics report).  Planning Dynamics estimated the
incremental cost of building the proposed atrium to be
approximately $9 million.  Planning Dynamics estimated that
constructing the proposed atrium would increase the rental rate
for 2UBC by $2 a square foot, thereby increasing the value of
2UBC by approximately $7 million.  Planning Dynamics estimated an
increased rental rate for the new office tower of $1 a square
foot, thereby increasing its value by approximately
$12.3 million, $3.5 million of which would inure to the benefit
of the Bank.  Although Mr. Holtz believed that the proposed
atrium would enhance the value of 3UBC, he did not project any
increase in value to 3UBC in the Planning Dynamics report because
3UBC was wholly occupied by the Bank and was not considered as a
sale property for the Bank.  Planning Dynamics calculated a value
over cost figure for constructing the proposed atrium of
approximately $1.5 million.  Planning Dynamics also estimated a
net annual operating deficit of $100,000 a year, based on
projected revenues and expenses of $500,000 and $600,000,
respectively.  In addition, the Planning Dynamics report stated:

> As you know the design problem from the beginning
has been to "bring" the Lincoln Street site to
Broadway.  This will allow the One United Bank Center
building to gain the benefits of a 100% corner location
in lieu of a secondary location.  The main benefit is
higher rents as previously mentioned.
>
> The unique architectural design of the Atrium
sensitively embraces Two United Bank Center and
continues to present this fine building to the 17th and
Broadway location.  At the same time the Atrium creates

a powerful "memory shape" impression which gives unity to four different buildings and creates the "Center". In seeing this shape again at the top of One United Bank Center viewers will visually identify with the "Center" from vantage points all over Denver. When one sees the top ones [sic] mind will automatically recall the shape at the Atrium level.

This design will give the Bank great visual and location identity as did the designs for Pennzoil in Houston and Transamerica in San Francisco and should be very helpful in marketing and staying unique among tough competitors.

### e. The Committee Meeting of August 25, 1980

On August 25, 1980, the Committee considered the issue of whether the proposed atrium should be retained as part of the Project. The Committee reviewed the Harrison Price Report, the Planning Dynamics report, and financial projections showing the impact that construction of the proposed atrium could have on earnings by increasing the Bank's market share. The minutes of the Committee meeting on August 25, 1980, in part, provide:

Bank management feels very positive about the project. The general feeling of the Bank is in favor of the enclosed atrium to allow the Bank to achieve a larger market share. The atrium should create a major center, making United Bank Center a nationally notable building complex.

### f. Approval of the Facilities Master Plan

On September 8, 1980, the Committee approved the Facilities Master Plan, which included construction of the proposed atrium. On September 10, 1980, that plan was approved at a joint meeting of the boards of directors of UBC and UBD.

3. The 1981 Transactions

a. The 1700 Partnership

1700 Lincoln Limited (the 1700 Partnership) was a Colorado limited partnership. Hines Colorado Ltd. (Hines Colorado), a Colorado limited partnership, was the sole general partner of the 1700 Partnership, and ARICO America Realestate Investment Co. (ARICO), a Nevada corporation operating as a real estate investment trust, was the sole limited partner of the 1700 Partnership.

b. The Ground Lease

By a lease agreement dated February 5, 1981, LBC leased to the 1700 Partnership for a term of 70 years (1) land on the south end of the Lincoln-Sherman block (between Motorbank I and 17th Avenue) and (2) land on the south end of the Sherman-Grant block (together, the 1UBC land) (the Ground Lease). The Ground Lease provided that the 1700 Partnership would, at its own expense, construct an office tower on the Lincoln-Sherman block (1UBC) and a parking garage on the Sherman-Grant block (the Parking Garage), according to the plans and specifications appended to the Ground Lease. The Ground Lease provided for the payment to LBC of both a fixed rent and a rent based on the net cash flow generated by 1UBC and the Parking Garage.

Following the execution of the Ground Lease and related documents, the 1700 Partnership commenced construction of 1UBC,

which is a 52-story office tower with approximately 1,174,200 square feet of rentable space, and of the Parking Garage; construction was completed in the second half of 1983.

c. <u>The Atrium Project Agreement</u>

Concurrently with the execution of the Ground Lease, the Bank and the 1700 Partnership entered into an agreement dated February 5, 1981, whereby the Bank, at its sole expense, would construct a glass atrium (the Atrium) on the Broadway-Lincoln block, enclosing the area between 2UBC and 3UBC (and east of 2UBC) (the Atrium Project Agreement). The Atrium Project Agreement stated that the Atrium and the Skyway, see <u>infra</u> sec. II.A.3.d., were being constructed "in order to accomplish the appropriate integration of the New Project [1UBC] with the Principal Bank Property [2UBC and 3UBC]." The Developer and the 1700 Partnership would not have made the commitment to build 1UBC had the Bank not made a commitment to build the Atrium. In 1984, at the request of the Bank, the architectural plans for the Atrium were modified to reduce the scale of the Atrium and to address certain safety concerns.

d. <u>The Skyway Agreement, The 1981 Easement Agreement, and The Space Lease</u>

Concurrently with the execution of the Ground Lease and the Atrium Project Agreement, the Bank and the 1700 Partnership entered into an agreement dated February 5, 1981, whereby the

1700 Partnership would construct an elevated, enclosed pedestrian walkway (the Skyway) connecting 1UBC with the Atrium, and the costs of construction and maintenance of the Skyway would be shared equally by the 1700 Partnership and the Bank (the Skyway Agreement).

Concurrently with the execution of the Ground Lease, the Atrium Project Agreement, and the Skyway Agreement, the Bank and the 1700 Partnership entered into an agreement dated February 5, 1981, whereby the Bank granted to the 1700 Partnership, its successors and assigns, and to the current and future fee owners of the 1UBC land and improvements thereon, an easement for pedestrian access in, on, over, and through the common areas of the Bank's property on the Broadway-Lincoln and Lincoln-Sherman blocks, including the Atrium (the 1981 Easement Agreement). In addition, under the 1981 Easement Agreement, the 1700 Partnership granted to the Bank an easement for pedestrian access in, on, over, and through the common areas of 1UBC.

Concurrently with the execution of the Ground Lease, the Atrium Project Agreement, the Skyway Agreement, and the 1981 Easement Agreement, the Bank and the 1700 Partnership entered into an agreement dated February 5, 1981, whereby the Bank agreed to lease (approximately 500,000 square feet of) space in 1UBC.

### 4.  The Ross and Eastdil Reports

In 1984, prior to construction of the Atrium, the Bank retained two real estate consulting firms, Ross Consulting and

Eastdil Realty, Inc. (Eastdil Realty), to evaluate the Bank's

real estate holdings and to make recommendations regarding the

possible sale of properties held by the Bank.  Ross Consulting

prepared a report dated February 6, 1984, entitled "Working

Outline--Real Estate Sale Considerations" (the Ross report),

which was reviewed by the Committee at its meeting of

February 17, 1984.  The Ross report's recommendations regarding

the Atrium were, in part, as follows:

> Our recommendations flow from the assumption that UBC will construct the Atrium.  Examination of benefits therefrom (either higher rents or higher purchase price) suggest that UBC should build only if legally or "morally" bound to.

> Ross presumes that the proposed Atrium will be more valuable, or will add more value to adjacent properties, once completed.  Our analysis has proceeded from the standpoint of weighing cost of waiting for completion versus benefit to be gained thereby. Therefore, wait to sell Atrium until constructed, if economically possible.  Although Atrium adds to Bank image, it does not yield 1:1 dollars to third party investor return.  Guarantees for construction will complicate the deal.

> To "cleanly" justify Atrium construction, cash flow must be increased by 2.5 million a year ($25 million cost capitalized by 10%).  This amount is a 100% increase over current annual UBC II rental income.  Whether current leases in UBC II can be renegotiated and UBC will pay higher rents in III on a leaseback due to Atrium's presence remains to be seen. Higher rents are more likely to be negotiated during a possibly healthier downtown real estate market in 1986- 1988, especially with the new Atrium serving to "refurbish" the UBD complex, as opposed to renegotiation of rents in the current "tenant's market," pointing at architectural plans for the Atrium.

> Presume that maximum value of Atrium would be realized by sale of UBC II and III together (to same

investor).

Eastdil Realty prepared a report dated July 16, 1984, entitled "Report to the United Banks of Colorado on One, Two and Three United Bank Centers and the Atrium Commitment" (the Eastdil report), which was reviewed by the Committee at its meeting of September 24, 1984. An observation made in the Eastdil report provides:

> <u>Construction of the atrium will inhibit the Bank from selling its Broadway-Lincoln property as one unit. This may reduce the proceeds from the sale of the Bank's property on the block.</u> In the discussion of the Broadway-Lincoln block below, we conclude the Bank may be able to get more for its Broadway-Lincoln property if it is sold as one package rather than if Two and Three United Bank Center are sold separately. If the entire block is sold as a package, the purchaser can keep the existing buildings, or replace them with a new 52-story office tower at some future date. This assumes, however, that the atrium is not built.
>
> If the atrium is built, the remaining ground area on the Bank's portion of the block is not sufficient to support a 52-story building. As a result, the block is no longer as attractive a development site, and as such will probably not command as high a sales price.

In addition, the Eastdil report estimated that the present value of the net cash flow that would be generated by the retail operations planned for the Atrium was $2.7 million. The report noted that, although optimistic, the present value of the net cash flow that could be generated from adding 39,000 square feet of additional retail space "by opening the second and third floors of Three United Bank Center to retail and building Two United Bank Center out at the ground level to the sidewalk on <u>all</u> sides and on the second floor" could be as high as $6.9 million.

The Eastdil report concluded that, under the most likely scenario, the net present value of the additional income to be generated by the Atrium, both directly from retail space in the Atrium and indirectly from increased rents from 1UBC and 2UBC, was $6.2 million and could not alone justify the $25 million cost of constructing the Atrium. The Eastdil Report, however, qualified that conclusion as follows:

> Notwithstanding the significant construction risk associated with building the atrium, there may be reasons why the Bank should consider proceeding with the project. Successful completion of the atrium will enhance the Bank's image in the community and give it greater recognition in the region. It is not realistic for us to place a dollar value on these benefits. Undoubtedly they are substantial and could produce a direct and positive impact on the Bank's business. More significantly, if the Bank does not complete construction of the atrium, its image in the community may be tarnished. It is clear that the Bank has an obligation to its partners and to the tenants in One United Bank Center to complete construction of the atrium facility, or, if possible substitute another amenity to be completed at a later date. If the atrium is not built, the building owners run the substantial risk that at least some tenants will sue to reduce their rents or get out of their leases altogether. The cost of securing a release from the atrium obligation could tip the balance in favor of completing the atrium facility.

The Eastdil report recommended "against building the atrium if the Bank can obtain release from its commitment for less than $22 million less whatever `recognition value' the Bank believes the atrium would produce."

### 5. The Committee Meeting of October 24, 1984

At the meeting of the Committee on October 24, 1984, Bank management proposed to offer 2UBC and the Ground Lease for sale

at an asking price in the range of $33 million each.  In its presentation to the Committee, management cited several reasons for selling 2UBC at that time, but acknowledged that "[a] sale now may not fully reflect the value to be added by the Atrium when it is completed."  The committee approved the proposal to offer 2UBC and the Ground Lease for sale.  In addition, management recommended that construction of the Atrium proceed.  Considerations for completing the Atrium that were noted in the presentation to the Committee were as follows:

> A.  The Atrium retains a great deal of appeal; architecturally, as an enhancement to the Bank's image, and in value added to the properties.

> B.  We think our minimum cost not to build would be about $16,000,000.  It makes more sense to build it for $25,000,000 than to not build it at a cost of $16,000,000.

At the meeting, the Committee approved the budget for the Atrium.

### 6.  Construction and Operation of the Atrium

Construction of the Atrium commenced in April 1985 and was completed in late 1987; however, portions of the Atrium were open to the public in 1986.  The Atrium sits on an irregularly shaped, 30,510 square-foot parcel of land on the Broadway-Lincoln block and has frontage of 96.40 feet along Broadway, 198.75 feet along Lincoln Street, and 113.32 feet along 17th Avenue.  The Atrium covers a 24,333 square-foot area, encompasses approximately 4.6 million cubic feet of space, and, at its highest point, is 14 stories tall.  The Atrium is constructed of glass, steel, and stone.  The Atrium is physically attached to both 2UBC and 3UBC

and is connected to 1UBC by the Skyway.  There are pedestrian entrances to the Atrium in 2UBC, 3UBC, and the Skyway, and on Broadway, Lincoln Street, and 17th Avenue.

The Atrium shares its mechanical systems with 2UBC; those systems are located below ground within 2UBC.  The basement area of the Atrium is used for storage and houses a backup power generator.  The Atrium contains space for one restaurant and retail space for one tenant.

Beginning about 1988, UBD owned and operated The Atrium Cafe, which seated approximately 135 people, and UBD paid a fee to a contractor to manage the restaurant's operations.  Beginning in 1994, UBD discontinued operating The Atrium Cafe and leased the space for the operation of another restaurant.  UBD also leased space for the operation of "expresso carts".

Beginning on October 12, 1987, for a 10-year term, the retail space in the Atrium had been leased for the operation of a Russell's convenience store (the Russell's lease).

From the time of the Atrium's opening in 1986, the only operating revenues generated by the Atrium have been derived from the Russell's lease and from the operations of The Atrium Cafe and other food operations.  Those operating revenues have been less than overhead expenses (maintenance, utilities, taxes, etc.), resulting in net operating losses during the period 1989 through 1995, as follows:

| Year | Income (Loss) | Overhead Expense | Total Atrium Loss |
|------|---------------|------------------|-------------------|
| 1989 | ($13,781) | $478,890 | $492,671 |
| 1990 | (21,026) | 533,198 | 554,224 |
| 1991 | (22,728) | 564,120 | 586,848 |
| 1992 | 992 | 525,548 | 524,556 |
| 1993 | (46,294) | 731,558 | 777,852 |
| 1994 | 24,216 | 745,909 | 721,693 |
| 1995 | 98,899 | 788,724 | 689,825 |

The Bank has never maintained teller windows or other banking facilities in the Atrium and has never solicited new customers from within the Atrium. The Bank has never held business meetings in the Atrium and has never leased the Atrium for events. The Bank, however, allows the use of the Atrium by community groups an average of once a month.

7. The Atrium Assets: Cost Bases and Depreciation

LBC constructed the Atrium Cafe and installed equipment, furniture, and fixtures therein.

During the years in issue, LBC installed a security system and signage in the Atrium (the Atrium Security System and Signage).

During the years in issue, LBC incurred costs to construct, equip, and install the Skyway, The Atrium Cafe, the Atrium Security System and Signage, and the remaining components of the Atrium (the Atrium Structure) (collectively, the Atrium Assets). The cost bases of the Atrium Assets placed in service during the years in issue, as adjusted pursuant to section 48(q) for the investment tax credits claimed with respect to such assets, were as follows:

| | Cost Bases | | | |
|---|---|---|---|---|
| Taxable Year Placed in Service | Atrium Structure | Skyway | Atrium Cafe | Atrium Security System and Signage |
| 1986 | $31,805,978 | -- | -- | -- |
| 1987 | -- | $26,195 | $1,676,090 | $246,453 |
| 1989 | -- | -- | 2,058 | 699 |
| 1990 | 144,261 | -- | 21,917 | 10,800 |

On its Federal income tax returns for the taxable years 1986 through 1991, the UBC affiliated group claimed depreciation deductions with respect to the Atrium Assets as follows:

| | Depreciation Claimed | | | |
|---|---|---|---|---|
| Taxable Year | Atrium Structure | Skyway | Atrium Cafe | Atrium Security System and Signage |
| 1986 | $234,121 | -- | -- | -- |
| 1987 | 2,458,735 | $2,009 | $134,960 | -- |
| 1988 | 2,104,223 | 938 | 266,895 | $60,381 |
| 1989 | 1,190,409 | 930 | 190,190 | 43,211 |
| 1990 | 1,191,171 | 930 | 148,151 | 31,505 |
| 1991 | 344,402 | 295 | 39,458 | 8,955 |

The depreciation deductions claimed on the Atrium Assets were computed on 100 percent of the cost bases of the assets as set forth above, except that, after 1988, the depreciation deductions claimed with respect to the Skyway and that portion of the Atrium Structure placed in service prior to 1989 were computed on 51.5152 percent of the assets' cost bases.

8. The 2UBC Transaction

a. The Various Agreements

Den-Cal Co. (Den-Cal) was a California limited partnership whose managing general partner was Emerik Properties Corp. (Emerik).

By a purchase and sale agreement dated July 16, 1985, LBC sold 2UBC and the land thereunder and an undivided 50-percent

interest in Motorbank I and the land thereunder to Den-Cal for $35,500,000 (the 2UBC Sale Agreement).

Concurrently with the execution of the 2UBC Sale Agreement and other agreements, LBC and Den-Cal entered into an agreement that required LBC to construct the Atrium and the Skyway and to make certain improvements to 2UBC (the 2UBC Construction Agreement). Pursuant to the 2UBC Construction Agreement, LBC and Den-Cal granted to each other certain reciprocal easements pertaining to the ingress and egress of pedestrians through common areas, including the Atrium. In addition, LBC agreed to maintain its improvements on the Broadway-Lincoln block, including the Atrium, at its sole cost and expense.

LBC agreed to operate the Atrium in an attractive and orderly manner and to refrain from substantially modifying the exterior design of the Atrium for a 35-year period commencing on November 1, 1986, and running through October 31, 2021, and thereafter until LBC provides at least 6 months' notice to Den-Cal of its election to terminate (the Atrium Operating Covenants). The 2UBC Construction Agreement, however, allowed LBC to terminate its obligations relating to the Atrium after June 30, 2001, upon payment to Den-Cal of a termination fee and the occurrence of certain other conditions. LBC and Den-Cal acknowledged that LBC's election to terminate the Atrium Operating Covenants "would result in the diminution in value of Two United Bank Center in an amount at least as large as the

termination fee", and, accordingly, LBC granted to Den-Cal a lien to secure performance under the Atrium Operating Covenants in the event that the Atrium were razed prior to expiration of the obligations.

The 2UBC Sale Agreement, the 2UBC Construction Agreement, and related agreements shall be referred to collectively as the 2UBC Transaction.

b.  Tax Treatment of the 2UBC Transaction

As a result of the 2UBC Transaction, LBC realized the following amounts from the sale of its properties:

| Property | Amount Realized |
| --- | --- |
| 2UBC improvements | $22,847,841 |
| 2UBC land | 4,219,181 |
| 50-percent interest in Motorbank I improvements | 9,795,022 |
| 50-percent interest in Motorbank I land | 2,038,506 |

On January 26, 1988, the UBC affiliated group filed an amended corporate income tax return for its 1985 taxable year, on which the UBC affiliated group reported adjusted bases for determining gain or loss from the sale of its properties in the 2UBC Transaction as follows:

| Property | Adjusted Basis |
| --- | --- |
| 2UBC improvements | $15,533,317 |
| 2UBC land | 664,559 |
| 50-percent interest in Motorbank I improvements | 1,816,730 |

```
50-percent interest in
Motorbank I land                    321,083
```

The parties agree that those adjusted bases are correct, except to the extent, if any, that the cost of the Atrium Assets, see supra sec. II.A.7., is allocable to the bases of the properties sold in the 2UBC transaction.

### 9. The 3UBC Transaction

#### a. The Various Agreements

By purchase and sale agreement dated December 31, 1987, LBC sold 3UBC, but not the land underlying 3UBC (the 3UBC land), to Holme, Roberts & Owen (HRO), a partnership that was engaged in the practice of law and that served as the Bank's legal counsel during the years in issue (the 3UBC Sale Agreement). The purchase price of $15,957,648 was paid by a note that was nonrecourse to the partners of HRO; however, the note was secured by a deed of trust to 3UBC and an irrevocable letter of credit in the amount of $2.4 million.

By an agreement dated December 31, 1987, LBC leased the 3UBC land to HRO for a term commencing on December 31, 1987, and running for 34 years and 9 months (the 3UBC Ground Lease). For the period through September 30, 2012, the annual rent was $25,000 plus 30 percent of any net rental income generated by 3UBC in excess of $2.5 million. After September 30, 2012, the rent was to be at fair market value. Pursuant to the 3UBC Ground Lease, LBC and HRO granted to each other certain reciprocal easements pertaining to the ingress and egress of pedestrians

through common areas, including the Atrium. Also, LBC agreed to operate the Atrium in an attractive and orderly manner and to refrain from substantially modifying the exterior design of the Atrium. In the event that the Atrium was materially damaged, destroyed by fire or other casualty, or taken by condemnation, LBC had the option to rebuild, replace, repair, or raze the Atrium. If LBC elected to raze the Atrium, LBC was required to cover the area with an attractive surface until rebuilding (if any) and to grant HRO a 40-foot setback easement on the south side of the 3UBC land.

By an agreement dated December 31, 1987, UBD leased back the entirety of 3UBC from HRO (the 3UBC Space Lease). The 3UBC Space Lease had an initial term of 9 years and 6 months and automatically renewed for a second term running until September 30, 2012, unless UBD elected otherwise. The rent was $2,070,000 a year during the initial term and $2,333,452 a year during the second term. The 3UBC Space Lease required that UBD pay all expenses and taxes, maintain and repair the building, insure the building, and replace the building if destroyed.

On December 31, 1987, LBC assumed HRO's lease of approximately 122,000 square feet of space in 2UBC and subleased to HRO approximately 130,000 square feet of space in 1UBC.

The 3UBC Sale Agreement, the 3UBC Ground Lease, the 3UBC Space Lease, the agreements relating to HRO's lease in 2UBC and sublease in 1UBC, and related agreements shall be referred to

collectively as the 3UBC Transaction.

        b.   Tax Treatment of the 3UBC Transaction

On its Federal income tax return filed for 1988, the UBC affiliated group reported gain on the installment basis using an amount realized of $14,201,933 from the sale of 3UBC. The parties agree that the reported amount is the correct amount realized for purposes of determining gain or loss from the sale of 3UBC.

On its Federal income tax return filed for 1988, the UBC affiliated group reported gain on the installment basis using an adjusted basis of $5,321,361 for purposes of determining gain or loss on the sale of 3UBC. The parties agree that the reported adjusted basis is correct, except to the extent, if any, that the cost of the Atrium Assets, see supra sec. II.A.7., is allocable to the basis of 3UBC.

        10.  The 1UBC Land Transaction

By a purchase and sale agreement dated December 30, 1988, LBC sold the 1UBC land (together with LBC's interest in the Ground Lease relating to the 1UBC land) to ARICO (the 1UBC land transaction). LBC realized $2,900,000 as a result of that transaction. On its Federal income tax return filed for 1988, the UBC affiliated group reported the sale of the 1UBC land as a long-term capital loss using an adjusted basis of $2,953,980. The parties agree that the reported adjusted basis is correct,

except to the extent, if any, that the cost of the Atrium Assets, see supra sec. II.A.7., is allocable to the basis of 3UBC.

11. The 1988 Atrium Transaction

a. Background

On December 29, 1988, LBC and Broadway Atrium Limited (BAL), a Colorado limited partnership consisting of ARICO and Hines Colorado, formed Lincoln Atrium Limited (LAL), a Colorado limited partnership. LBC was the general partner of LAL, with a 1-percent "sharing ratio" based on an initial contribution of a 0.4848-percent undivided interest in the "Atrium" (as described in the LAL partnership agreement). BAL was the sole limited partner of LAL, with a 99-percent "sharing ratio" based on an initial contribution of a 48-percent undivided interest in the "Atrium", contributed to BAL by ARICO upon acquisition from LBC, see infra sec. II.A.11.b.

On December 30, 1988, UBC, UBD, LBC, LAL, BAL, ARICO, the 1700 Partnership, and Hines Colorado entered into a number of transactions (the 1988 transactions).

b. The Atrium Sale Agreement

The 1988 transactions included an agreement titled "Atrium Purchase, Sale and Lease Agreement", dated December 30, 1988, between UBD, LBC, and ARICO (the Atrium Sale Agreement). Pursuant to the Atrium Sale Agreement, LBC sold to ARICO an undivided 48-percent interest in the land underlying the Atrium,

all improvements on that land, all rights and interests appurtenant to that land (collectively, the Atrium Land), and certain other property (together, the Atrium Property). In consideration of LBC's conveyance of the Atrium Property, ARICO agreed to pay a purchase price of $17,100,000 by means of a promissory note.

The Atrium Sale Agreement contained a recital stating as follows: "Seller [LBC] desires to sell the [Atrium] Property to Purchaser [ARICO] and Purchaser desires to purchase the Property from Seller on the terms and conditions set forth in the Agreement."

Section 8.13 of the Atrium Sale Agreement states as follows:

The parties hereto hereby acknowledge and agree that the transaction relating to the Property contemplated by this Agreement is, for tax purposes, a purchase, sale, and lease transaction. Furthermore, the parties hereby agree that following the Closing, each party shall report the transaction as a purchase, sale, and lease on their respective income tax returns; and specifically, that (a) Seller shall report the transaction as a sale on its income tax return and shall recognize the gain or loss therefrom either currently or on an installment basis, and (b) Purchaser shall report the transaction as a purchase on its income tax return.

The Atrium Sale Agreement also provided that certain other agreements would be executed by the parties and related entities (the Atrium Sale Agreement and related agreements shall hereafter be referred to collectively as the 1988 Atrium Transaction). One of those agreements was an agreement titled "Atrium Lease", dated December 30, 1988, between LBC and LAL, as landlords, and UBD, as

tenant.  Pursuant to the Atrium Lease, UBD agreed to lease the Atrium Land for a period of 30-1/2 years, commencing December 30, 1988, and ending June 30, 2019.  The Atrium Lease provided that UBD would pay rent to LBC in the amount of $1 a year and to LAL in the following amounts: $1,893,939.39 annually from January 1, 1989, through December 31, 1998; $1,489,898.99 annually from January 1, 1999, through June 30, 2009; and $303,030.30 annually from July 1, 2009, through June 30, 2019.

The Atrium Lease contained a recital stating as follows: "LBC and LAL desire to lease their undivided interests in the Atrium to Tenant [UBD] in order to provide unified operation of the Atrium and Tenant desires to lease such interest from Landlord for the same purpose."

        c.   Tax Treatment by UBC of the 1988 Atrium Transaction

On its Federal income tax return for the taxable year 1988, the UBC affiliated group reported a gain on the sale of a 48-percent interest in the Atrium Structure and the Skyway of $3,803,496, based on an amount realized of $16,964,800, a cost basis of $15,345,273, and accumulated depreciation of $2,183,969. The reported amount realized was based on a total sales price for a 48-percent interest in the Atrium Structure, the Skyway, and the land underlying the Atrium of $17,100,000 less $135,200 allocated to the underlying land ($17,100,000 - $135,200 = $16,964,800).  The reported cost basis equaled 48 percent of the cost bases of the Skyway and that part of the Atrium Structure

placed in service prior to 1989, as adjusted under former section 48(q) for the investment credits claimed and investment credits recaptured with respect to those assets. The reported accumulated depreciation equaled 48 percent of the depreciation claimed on the Atrium Structure and the Skyway to the date of the reported sale. No gain or loss was reported as realized on the sale of the underlying land because the reported amount realized ($135,000) equaled the cost basis of the land.

On its Federal income tax returns for the taxable years 1989 through 1991, the UBC affiliated group took deductions for rental expenses on account of the Atrium Lease.

### d. UBC's Financial Statements

In the notes to UBC's affiliated financial statements for 1988 and 1989, UBC made disclosures of the Atrium Sale Agreement and the Atrium Lease as a sale and leaseback.

### e. Petitioner's Responses to Information Document Requests Regarding the Atrium

In a letter dated August 11, 1992, to the St. Paul office of the Internal Revenue Service (IRS) Appeals Division (Appeals Division), petitioner first claimed that the cost of the Atrium Assets should be allocated to the bases of adjoining properties. The Appeals Division referred petitioner's claim for cost allocation to the IRS Examination Division.

On January 11, 1993, the IRS agent assigned to review petitioner's claim (the IRS agent) issued an information document

request (IDR) to petitioner. Question four of that IDR states: "Who is the owner of the Atrium now? History of the Atrium ownership from 1985 till 1992?" In response to that question, petitioner stated, in part:

> On December 30, 1988, Lincoln Building Corporation sold an undivided 48% interest in the Atrium to ARICO America Real Estate Investment Company (ARICO). ARICO contributed its undivided 48% interest in the Atrium to Broadway Atrium Limited (Broadway). Broadway subsequently contributed the 48% undivided interest in the Atrium to Lincoln Atrium Limited. Lincoln Building Corporation contributed an additional .48% undivided interest in the Atrium to Lincoln Atrium Limited as its general partner. Consequently, ownership of the Atrium after the sale on December 30, 1988 was as follows:
>
> > 51.52% - Lincoln Building Corporation
> > 48.48% - Lincoln Atrium Limited, whose ownership is:
> >
> > > 99% - Broadway Atrium Limited
> > > 1% - Lincoln Building Corporation
>
> The ownership of the Atrium did not change during the period between December 30, 1988 and December 31, 1992.

On April 22, 1993, the IRS agent issued another IDR to petitioner requesting documentation pertaining to the sale of an interest in the Atrium referred to in petitioner's response to the first IDR. Petitioner's response to the second IDR referred to the transaction as a "sale of the 48% interest in the Atrium".

B.  The Atrium Assets: Allocation of the Costs

  1.  Issue

The issue is whether petitioner may allocate the cost of the Atrium Assets to the bases of other properties that were held by the Bank. If we decide that issue for petitioner, we must decide

the nature and extent of the proper allocation.

## 2. Arguments of the Parties

Relying on a line of cases that includes Estate of Collins v. Commissioner, 31 T.C. 238 (1958), and Willow Terrace Dev. Co. v. Commissioner, 40 T.C. 689 (1963), affd. 345 F.2d 933 (5th Cir. 1965) (the developer line of cases), petitioner argues that it is entitled under section 1016(a)(1)[2] to allocate the cost of the Atrium Assets to the bases of properties that benefited from the Atrium. Petitioner claims that "[t]he Bank constructed the Atrium for the purpose of creating an office building complex with the expectation that the buildings within the complex would increase in value" and that the Atrium, as a stand-alone asset, has negative value. Petitioner asserts that an allocation of the costs of "the Atrium Assets in proportion to the relative fair market values of the benefited properties as of December 31, 1987, the close of the year in which the Atrium was completed", is "equitable" and would result in a "proper adjustment" under section 1016(a)(1). Petitioner proposes the following allocation:

---

[2]    As pertinent to this case, sec. 1011 provides that the adjusted basis for determining gain or loss from the sale or other disposition of property is the cost of such property, see sec. 1012, adjusted as provided in sec. 1016. Sec. 1016(a)(1), in part, provides that proper adjustment is to be made for expenditures, receipts, losses, or other items, properly chargeable to capital account. Sec. 1.1016-2(a), Income Tax Regs., in part, states: "The cost or other basis shall be properly adjusted for any expenditure, receipt, loss, or other item, properly chargeable to capital account, including the cost of improvements and betterments made to the property."

| Property | Cost Allocation |
|----------|-----------------|
| 1UBC Land | $2,161,625 |
| 2UBC | 18,579,112 |
| 3UBC | 11,900,811 |
| 3UBC Land | 1,292,903 |

Respondent argues that section 1012 provides that the basis of property is the cost of such property and that "the amount paid for a given asset becomes the asset's cost basis and cannot be added to or combined with the basis of other assets." Respondent, however, acknowledges the developer line of cases, but asserts that those cases recognize a narrow exception to the general rule. Respondent claims that the present case is factually distinguishable from the developer line of cases and that the principles of those cases "have never been applied outside the narrow factual context in which those cases arose." In the alternative, respondent argues that, if the developer line of cases "have relevance beyond their unique facts", the present case fails to meet the requirements set forth in those cases. Lastly, respondent rejects petitioner's proposed allocation of the cost of the Atrium Assets based on the fair market values of the adjoining properties because those "values bear no necessary correlation to the economic benefits" that were anticipated by the Bank from the construction of the Atrium. According to respondent, an allocation, if any, "must be based on the bank's purpose for building the Atrium as of February of 1981 when it made the initial commitment to build the Atrium, or at the

latest, October of 1984 when it made the final decision to proceed with the Atrium's construction."

     3.   Analysis

     a.   The Developer Line of Cases

In Country Club Estates, Inc. v. Commissioner, 22 T.C. 1283 (1954), the taxpayer transferred approximately 300 acres of land and certain improvements located thereon to the Tuscon Country Club (the Club).  With the proceeds of a loan from the taxpayer, the Club agreed to construct on the transferred property a first-class country club that included an 18-hole golf course, club house, and recreational facilities.  The taxpayer anticipated that the construction of the country club would enhance the value of the surrounding property, which the taxpayer subdivided into lots for sale.  Relying on Commissioner v. Laguna Land & Water Co., 118 F.2d 112, 117 (9th Cir. 1941), affg. in part and revg. in part a Memorandum Opinion of the Board,[3] the taxpayer argued that the cost of the land transferred to the Club should be added to the cost of the lots sold.  The Court distinguished Biscayne Bay Islands Co. v. Commissioner, 23 B.T.A. 731 (1931),[4] despite

---

[3]    In that case, the Court of Appeals for the Ninth Circuit affirmed the Board of Tax Appeals' determination that a taxpayer should be allowed to deduct from the sales proceeds of certain lots expenditures made for streets, drives, curves, and other improvements, which benefited those lots.

[4]    In that case, the Board of Tax Appeals rejected the taxpayer's contention that no part of the cost of construction and development of an island subdivision should be allocated to a

(continued...)

the possibility that the transferred land could revert to the taxpayer upon the occurrence of certain contingencies.  The Court, citing Kentucky Land, Gas & Oil Co. v. Commissioner, 2 B.T.A. 838 (1925),[5] held that the basis of the lots included the cost of the property transferred to the Club because "the basic purpose of petitioner in transferring the land was to bring about the construction of a country club so as to induce people to buy nearby lots."  Country Club Estates, Inc. v. Commissioner, supra at 1293.

In Colony, Inc. v. Commissioner, 26 T.C. 30 (1956), affd. per curiam 244 F.2d 75 (6th Cir. 1957), a taxpayer in the business of developing and selling real estate argued that the cost of a water supply pumping system that provided water service

---

[4](...continued)
large interior area of the island that was reserved for 10 years (later extended an additional 3 years) as a playground and recreational center for the use of lot purchasers:

> [The interior] area was not permanently and irrevocably dedicated to the public, but may later be sold by petitioner.  The possibility of gain has only been postponed.  It is unlike the area used for public streets, which is permanently beyond the possibility of sale and gain, the cost of which must be absorbed in the salable lots.  * * *  [Biscayne Bay Islands Co. v. Commissioner, 23 B.T.A. 731, 735 (1931).]

[5]     In Kentucky Land, Gas & Oil Co. v. Commissioner, 2 B.T.A. 838 (1925), the taxpayer acquired a tract of oil land, which the taxpayer subdivided into lots.  The taxpayer drilled four wells on the subdivision.  The Board of Tax Appeals (the Board) held that the cost of drilling one well only was an additional cost of the lots and "a proper charge against the sale price of the lots sold" because the taxpayer was "bound to drill but one well" under the covenants in the deeds of conveyance.  Id. at 840.

to a subdivision should be added to the cost of the lots in the subdivision. This Court stated as follows:

> The difficulty with petitioner's contention is that, unlike the taxpayer in Country Club Estates, Inc., supra, the petitioner has not given up any property in order to sell its lots. For the funds it expended, the petitioner acquired a water supply system which it owned and operated during the taxable years and thereafter. It is true that the system has not been operated at a profit, due, perhaps, to the small number of houses which have been constructed at The Colony. And it also may be true, as petitioner contends, that the pumping station may be abandoned at some time in the future, when the facilities of the Lexington Water Company reach the subdivision. These circumstances, however, do not alter the fact that the petitioner retained full ownership and control of the water supply system during the taxable years, and that it did not part with the property for the benefit of the subdivision lots. Because of this retention of ownership, Country Club Estates, Inc., supra, is distinguishable. * * * [Id. at 46.]

This Court in Estate of Collins v. Commissioner, 31 T.C. at 256 (1958), distilled the decisions in Country Club Estates, Inc. v. Commissioner, supra, and Colony, Inc. v. Commissioner, supra, and announced the following test:

> A careful consideration of the cases above cited indicates that if a person engaged in the business of developing and exploiting a real estate subdivision constructs a facility thereon for the basic purpose of inducing people to buy lots therein, the cost of such construction is properly a part of the cost basis of the lots, even though the subdivider retains tenuous rights without practical value to the facility constructed (such as a contingent reversion), but if the subdivider retains "full ownership and control" of the facility and does "not part with the property [i.e., the facility constructed] for the benefit of the subdivision lots," then the cost of such facility is not properly a part of the cost basis of the lots. The rule of Estate of Collins has been applied in subsequent

cases.  In <u>Willow Terrace Dev. Co. v. Commissioner</u>, 40 T.C. at

701,[6] this Court stated:

> As we read the <u>Collins</u> case, the pivotal consideration
> is whether the basic purpose for constructing such
> utilities systems in real estate subdivisions is to
> induce people to buy lots in such subdivisions.  It is
> a question of fact, and in resolving it the profit and
> loss record of the operating company must, of course,
> be considered.  But this does not mean that the
> presence of some profit will always be fatal to the
> taxpayers's case.  * * *

In addition, this Court in <u>Noell v. Commissioner</u>, 66 T.C. 718,

725 (1976), stated as follows:

> The critical question is whether petitioner
> intended to hold the facilities to realize a return on
> his capital from business operations, to recover his
> capital from a future sale, or some combination of the

---

[6]    The Court of Appeals for the Fifth Circuit stated as
follows:

> The problem presented by these cases is whether
> deduction or capitalization of such costs will more
> accurately reflect the economic realities of the
> situation from the standpoint of the subdivider.  We
> cannot accept the rule advocated by the Commissioner,
> which in effect allows deduction only when the costs
> can be recovered in no other manner.  Some relevant
> factors to be considered in determining the proper tax
> treatment of the costs of such facilities are whether
> they were essential to the sale of the lots or houses,
> whether the purpose or intent of the subdivider in
> constructing them was to sell lots or to make an
> independent investment in activity ancillary to the
> sale of lots or houses, whether and the extent to which
> the facilities are dedicated to the homeowners, what
> rights and of what value are retained by the
> subdivider, and the likelihood of recovery of the costs
> through subsequent sale.  These factors were considered
> in Collins, and the holding centered on the basic
> purpose test as modified by ownership.  * * *  [<u>Willow
> Terrace Dev. Co. v. Commissioner</u>, 345 F.2d 933, 938
> (5th Cir. 1965).]

two; or whether, on the other hand, he so encumbered his property with rights running to the property owners (regardless of who retained nominal title) that he in substance disposed of these facilities, intending to recover his capital, and derive a return of his investment through the sale of the lots.[10]  * * *

[10]Actually, in most of the cases, the asset involved is encumbered with rights running to the property owners which significantly diminish the value of an asset which nevertheless retains substantial value.  This diminution, resulting from restrictions benefiting the adjacent lots, represents a pro tanto disposal with each lot.  However, there is no basis in the decided cases, and certainly none in the record before us, for making an allocation based on the rights disposed of and the property retained.

See also Derby Heights, Inc. v. Commissioner, 48 T.C. 900 (1967); Dahling v. Commissioner, T.C. Memo. 1988-430; Bryce's Mountain Resort, Inc. v. Commissioner, T.C. Memo. 1985-293; Montclair Dev. Co. v. Commissioner, T.C. Memo. 1966-200.

b.   The Principles of the Developer Line of Cases

The developer line of cases all involve real estate developers that seek to allocate the cost of certain common improvements to the bases of residential lots held for sale. Respondent suggests that the principles of the developer line of cases are applicable only in that context because, "[i]n that context, both the purpose for incurring the costs and the properties benefitted thereby are readily identifiable."  An examination of the principles underlying the developer line of cases, however, does not suggest that those principles are restricted to any particular factual context or that difficulty in application justifies nonadherence.  We need not decide

whether those principles apply in every case; it is sufficient that we decide today that no rule of law proscribes their application to the case at bar.

The developer line of cases addresses the basic problem of what constitutes a proper adjustment to the basis of property in the context of a common improvement that benefits lots in a residential subdivision. Those cases focus on the common improvement and not directly on the lots held for sale. If an analysis of the common improvement indicates that (1) the basic purpose of the taxpayer in constructing the common improvement is to induce sales of the lots and (2) the taxpayer does not retain too much ownership and control of the common improvement, then the lots held for sale are deemed to include the allocable share of the cost of the common improvement. The rationale of the developer line of cases is that, when the basic purpose of property is the enhancement of other properties to induce their sale and such property does not have, in substance, an independent existence, total cost recovery for such property should be dependent on sale of the benefited properties. There is no principled basis here to distinguish between residential lots and the office buildings in question in the application of that logic. In sum, we believe that the logic underlying the developer line of cases is applicable outside the narrow context of allocating the cost of common improvements to the bases of residential lots held for sale, and, therefore, we shall

determine whether petitioner has satisfied the requirements set forth in those cases.

### c. Application of the Basic Purpose Test

The requirement that the basic purpose of a taxpayer in constructing a common improvement be to induce sales of benefited properties serves the purpose of justifying <u>total</u> cost recovery of the common improvement based on sales of the benefited properties. Cf. <u>Noell v. Commissioner</u>, <u>supra</u> at 725 n.10 (1976).[7] Petitioner apparently acknowledges that a pivotal question is whether the basic purpose of the Bank in constructing the Atrium was to induce sales of the Bank's adjoining properties. That question is one of fact, which we shall answer upon consideration of all the facts and circumstances. See <u>Willow Terrace Dev. Co. v. Commissioner</u>, 40 T.C. 689, 701 (1963).

Petitioner asserts: "The Bank constructed the Atrium for the purpose of creating an office building complex with the expectation that the buildings within the complex would increase in value." That purpose alone, however, without an intention to

---

[7] Such <u>total</u> basis recovery is a decided advantage not generally enjoyed by a taxpayer who disposes of less than his complete interest in property. See, e.g., sec. 1.61-6(a), Income Tax Regs. ("When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part."). Consider that a lessor of income producing property must take advance rentals into gross income in the year of receipt, sec. 1.61-8(b), Income Tax Regs., without any increased depreciation deduction in that year.

induce sales of the benefited properties, is insufficient under
the developer line of cases. Although the record indicates that
the Bank was aware that construction of the Atrium would enhance
the value of the Bank's adjoining properties, we believe that the
basic purpose of the Bank in constructing the Atrium was not the
enhancement of the adjoining properties <u>so as to induce sales of
those properties</u>, but rather the resolution of certain design
issues and the enhancement of the Bank's image. Value
enhancement of the Bank's adjoining properties was simply a
beneficial consequence of that basic purpose.[8]

On August 24, 1979, when architectural plans for the Project
were presented to the Committee for the first time, construction
of the Atrium was proposed as a means of resolving two major
design issues: (1) counteracting the off-Broadway location of the
proposed tower and (2) creating a center consisting of the
proposed tower and the existing bank facilities. By September
1980, when construction of the proposed atrium was approved, the
Bank had the benefit of both the Harrison Price and Planning
Dynamics reports. Both reports recommended construction of the
proposed atrium based on three factors: (1) increased rental

---

[8]     It appears that petitioner would likely not dispute that
assertion; in its brief, petitioner states: "[A]lthough the
impetus for building the Atrium came from the construction of
1UBC (including the need for a `front door on Broadway'), the
Bank expected that 2UBC - the largest building to which the
Atrium is physically attached - would be the beneficiary of the
largest value increase."

rates of adjoining properties, (2) ability to counteract the off-Broadway location of the proposed tower, and (3) enhancement of the Bank's image, which would be reflected in a greater market share. Reflective of those reports, the minutes of the Committee meeting on August 25, 1980, in part, provide:

> Bank management feels very positive about the project. The general feeling of the Bank is in favor of the enclosed atrium to allow the Bank to achieve a larger market share. The atrium should create a major center, making United Bank Center a nationally notable building complex.

At that time, however, there were no immediate plans to sell any of the adjoining properties, and, thus, there is simply no basis to find that the Bank approved construction of the proposed atrium so as to induce sales of those properties.[9]

---

[9] Petitioner proposes the following finding of fact:

> During 1978-1979, while the Bank was negotiating and planning the construction of 1UBC and the Atrium, the Bank gave consideration to selling some of its properties in United Bank Center. * * *

Petitioner apparently supports that finding only with the following testimony of Mr. Richard A. Kirk, president of UBD in 1979:

> [Counsel for petitioner]: In the time frame 1978-9 to 1984, before the construction of the Atrium commenced, did LBC consider selling any of its properties in United Bank Center?
> [Mr. Kirk]: Yes.
> [Counsel]: Do you know which properties were under consideration for sale?
> [Mr. Kirk]: We would--we had a lot of real estate, as is evidenced here, and I think in those days we were coming to a conclusion that that wasn't necessarily the best place for us to have our monies.

(continued...)

In addition, when the budget for construction of the proposed atrium was approved in 1984, the Bank was advised by both Ross Consulting and Eastdil Realty that the cost of construction would far exceed any increase in values to the adjoining properties.  Indeed, the Eastdil report noted that "[c]onstruction of the atrium will inhibit the Bank from selling its Broadway-Lincoln property as one unit.  This may reduce the proceeds from the sale of the Bank's property on the block." (Emphasis omitted.)  Ross Consulting recommended that "UBC should build only if legally or `morally' bound to", and Eastdil Realty recommended "against building the atrium if the Bank can obtain release from its commitment for less than $22 million less whatever `recognition value' the Bank believes the atrium would

---

[9](...continued)
> You know, we could put our money to work in lots of
> different ways.
>    And so I think that it is fair to say that around
> that time, we started--we were dealing more and more
> with real estate, and we were thinking more and more
> about it is it logical, do we need it all, should we
> move some parcel.

>    I can't remember exactly which we were talking
> about at the time, but it is definitely my recollection
> that we were, you know, considering the validity of
> holding all of this real estate.

The minutes of the Committee meeting on Sept. 10, 1981, provide the earliest documentary evidence that the Bank considered sales of its real estate:

> It is the Bank's intention to investigate the
> possibility of selling various elements of our real
> property as a means of generating additional capital.
> * * *

produce."  At the Committee meeting of October 24, 1984, when the budget for the Atrium was approved, considerations for completing the Atrium that were noted in the presentation to the Committee were as follows:

> A.  The Atrium retains a great deal of appeal; architecturally, as an enhancement to the Bank's image, and in value added to the properties.

> B.  We think our minimum cost not to build would be about $16,000,000.  It makes more sense to build it for $25,000,000 than to not build it at a cost of $16,000,000.

We believe that the Bank initially approved construction of the proposed atrium in 1980 and entered into the commitment to build in 1981 to address certain design issues and to enhance the Bank's image; enhancement of value in the adjoining properties was an ancillary consideration, and we so find.  We believe that the Bank's motivation derived, in significant part, from the fact that the Developer and the 1700 Partnership would not have made a commitment to build 1UBC had the Bank not made a commitment to build the Atrium.  When the budget for the Atrium was approved in 1984, enhancement of value of the adjoining properties was simply one of many considerations that led to the budget's approval. Lastly, the Bank was aware that any value to be added to the property by the construction of the Atrium would not be fully realized in a sale prior to completion of the Atrium; nevertheless, the Bank sold 2UBC in 1985.  In sum, upon consideration of all the facts and circumstances, we believe that

the basic purpose of the Atrium was not the enhancement of the adjoining properties so as to induce sales of those properties, and we so find.[10]

### 4. Conclusion

Our finding with respect to the Bank's basic purpose renders an analysis of the extent of the Bank's retained interest in the Atrium unnecessary. In any event, we believe that such an analysis would support our conclusion that cost recovery for the Atrium should be independent of sales of the adjoining properties. Although both the easements allowing ingress and egress of pedestrians and the Bank's obligation to maintain and operate the Atrium at its sole cost and expense for a period of years restricted the Bank's ownership and control of the Atrium, such restrictions did not prevent the Bank from entering into a

---

[10] The fact that the Atrium has consistently generated net operating losses does not change our conclusion. If the presence of some profit is not always fatal to a taxpayer's case, we believe then that the absence of profit is also not dispositive. See Willow Terrace Dev. Co. v. Commissioner, 40 T.C. 689, 701 (1963), affd. 345 F.2d 933 (5th Cir. 1965); Colony, Inc. v. Commissioner, 26 T.C. 30, 46 (1956), affd. per curiam 244 F.2d 75 (6th Cir. 1957); Bryce's Mountain Resort, Inc. v. Commissioner, T.C. Memo. 1985-293; Montclair Dev. Co. v. Commissioner, T.C. Memo. 1966-200. But more importantly, the Atrium's operating loss figures do not consider the benefits (if any) derived by the Bank when it entered into the commitment to build the Atrium in 1981 as part of an integrated series of agreements. We are unclear whether any possible benefits derived by the Bank as part of those agreements, e.g., a favorable lease agreement in 1UBC or enhanced Bank image derived from a prominent complex bearing the Bank's name, would skew the significance of those loss figures. Therefore, we have little confidence in the import of those figures.

series of transactions that included the sale of an undivided 48-percent interest in the Atrium to ARICO for $17.1 million in December 1988. Petitioner now challenges the form of that transaction and claims that the substance of the transaction constituted a financing arrangement. See infra sec. II.D. Although the fact that a taxpayer retains a salable interest in a common improvement is not dispositive of the analysis in the developer line of cases, see, e.g., Willow Terrace Dev. Co. v. Commissioner, 40 T.C. 689 (1963), the December 1988 transaction strongly indicates that the Bank did not intend to recover its investment in the Atrium through a sale of the adjoining properties.

Lastly, we note that petitioner's reliance on the developer line of cases is the sole reason that the basic purpose test was applied in this case. Nothing in those cases precluded petitioner from arguing that interests in the Atrium were conveyed in conjunction with sales of its adjoining properties and that an equitable allocation of the cost of the Atrium Assets, pursuant to section 1.61-6(a), Income Tax Regs., should be made to those interests to properly calculate gain or loss on the conveyance of those interests. See, e.g., Fasken v. Commissioner, 71 T.C. 650, 655-656 (1979) (when parts of a larger property are sold, an equitable apportionment of basis among the several parts is required for a proper calculation of gain, section 1.61-6(a), Income Tax Regs., but that principle is not

limited to the severance of realty into two or more parcels, but applies with respect to parts of the bundle of rights comprising property, including easements).  That argument, however, was not made by petitioner, and we need not address it any further.

    C.  <u>The Atrium Assets: Loss Deduction Under Section 165(a)</u>

In a footnote in petitioner's brief, petitioner, relying on <u>Echols v. Commissioner</u>, 950 F.2d 209 (5th Cir. 1991), argues that it is entitled to a loss deduction under section 165(a) for 1987 equal to the cost of the Atrium Assets because, although the Atrium was not abandoned in 1987, it was worthless.  Petitioner asserts:

> The Atrium was completed during 1987; and an
> independent appraisal has concluded that the Atrium had
> a negative value (i.e., was worthless) as of
> December 31, 1987.  The proper year of deduction under
> I.R.C. § 165(a) is 1987, as that is the year in which
> the Atrium was completed (i.e., became a closed
> transaction).

In response, respondent argues that petitioner's interpretation of <u>Echols v. Commissioner</u>, <u>supra</u>, is inconsistent with authority of this Court, and, in any event, the Atrium's worthlessness has not been established.

Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise.  To be allowable, a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and actually sustained during the taxable year.  Sec. 1.165-1(b), (d)(1), Income Tax Regs.  In <u>Echols v. Commissioner</u>, <u>supra</u> at

213, the Court of Appeals for the Fifth Circuit stated:

> the test for worthlessness is a combination of subjective and objective indicia:  a subjective determination by the taxpayer of the fact and the year of worthlessness to him, and the existence of objective factors reflecting completed transaction(s) and identifiable event(s) in the year in question--not limited, however, to transactions and events that rise to the level of divestiture of title or legal abandonment.

Nothing in that opinion, however, supports petitioner's apparent assertion that completion of construction of the Atrium alone provides sufficient objective evidence of the Atrium's worthlessness.  More importantly, petitioner has failed to establish a loss equal to the cost of the Atrium Assets pursuant to section 1.165-1(b) and (d)(1), Income Tax Regs., and we so find.  Therefore, petitioner is not entitled to a deduction under section 165(a).

D.  The 1988 Atrium Transaction: Disavowal of Form

1.  Issue

The issue is whether petitioner may disavow the form of the 1988 Atrium Transaction.  If we decide that issue for petitioner, we must determine the substance of the 1988 Atrium Transaction.

2.  Arguments of the Parties

Relying primarily on Helvering v. F. & R. Lazarus & Co., 308 U.S. 252 (1939), and Frank Lyon Co. v. Commissioner, 435 U.S. 561 (1978), petitioner argues that the substance of the 1988 Atrium Transaction, not its form, should govern for Federal income tax purposes.  Petitioner concedes that the 1988 Atrium Transaction

was in form a sale by LBC of a 48-percent interest in the Atrium Property to ARICO for $17,100,000 and a lease of the Atrium Land by UBD from LBC and LAL (following various transfers of interests in the Atrium Property to LAL). Petitioner argues, however, that, "as a matter of economic substance, the 1988 Atrium Transaction was a loan from ARICO to the Bank." In addition, petitioner argues that, in cases where a taxpayer challenges the form of a sale-leaseback transaction, no higher burden of proof applies, and, therefore, petitioner need only persuade the Court of the substance of the 1988 Atrium Transaction by the usual preponderance of the evidence.

In respondent's brief, respondent presents the issue as follows:

> the petitioner has taken the position that the costs of constructing the Atrium should have been allocated among the adjoining properties rather than to the Atrium itself. Accordingly, the notice of deficiency, as a protective measure, reduced the adjusted basis of the 48-percent interest in the Atrium sold by LBC to zero, thereby increasing LBC's gain on the sale by $13 million. The petitioner now claims that no gain or loss should have been recognized on the Atrium sale/leaseback because the transaction was merely a financing arrangement. * * * it is the respondent's position that the transaction was a sale/leaseback in substance as well as form. It is also the respondent's position, however, that the petitioner is precluded from disavowing the form of the transaction.

In making the latter argument, respondent relies primarily on Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Estate of Weinert v. Commissioner, 294 F.2d 750 (5th Cir. 1961), revg. and remanding

31 T.C. 918 (1959); <u>Estate of Durkin v. Commissioner</u>, 99 T.C. 561 (1992), supplementing T.C. Memo. 1992-325; <u>Illinois Power Co. v. Commissioner</u>, 87 T.C. 1417 (1986).

### 3. <u>Analysis</u>

#### a. <u>Introduction</u>

The terms of the various agreements that constitute the 1988 Atrium Transaction are unambiguous, and we so find. Indeed, petitioner does not argue to the contrary. Rather, petitioner contends that "[t]he issue in this case is the characterization, for Federal income tax purposes, of a transaction that is cast <u>in form</u> as a sale-leaseback, but in which the rights created are those of a borrower and a lender." This Court must determine as a threshold matter, however, whether petitioner may disavow the form of the 1988 Atrium Transaction.

#### b. <u>The Danielson Rule Does Not Apply</u>

In <u>Commissioner v. Danielson</u>, <u>supra</u>, the Court of Appeals for the Third Circuit held that certain taxpayers were precluded from challenging for tax purposes the terms of certain agreements that made purchase price allocations to covenants not to compete. The court enunciated the so-called Danielson rule:

> a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [<u>Id.</u> at 775.]

Even assuming, arguendo, that the Danielson rule applies in cases

where a taxpayer attempts to disavow the form of a sale-leaseback transaction, this Court would not apply the rule in this particular case.  This Court has declined to adopt the Danielson rule, see, e.g., Coleman v. Commissioner, 87 T.C. 178, 202 n.17 (1986); Elrod v. Commissioner, 87 T.C. 1046, 1065 (1986),[11] affd. without published opinion 833 F.2d 303 (3d Cir. 1987), and does not apply the rule unless appeal in the particular case lies to a Court of Appeals that has explicitly adopted the rule, see Meredith Corp. & Subs. v. Commissioner, 102 T.C. 406, 439-440 (1994).  The parties agree that appeal in this case will lie to the Court of Appeals for the Eighth Circuit.  The position of that court with respect to the Danielson rule is unclear, see id. at 440 (discussing Molasky v. Commissioner, 897 F.2d 334 (8th Cir. 1990), affg. in part, revg. in part and remanding T.C. Memo. 1988-173), and, therefore, we shall not apply the Danielson rule in this case.

> c.  Respondent's Weinert Rule

Respondent argues that, apart from the Danielson rule, a rule that originated in Estate of Weinert v. Commissioner, 294 F.2d 750 (5th Cir. 1961), revg. and remanding 31 T.C. 918 (1959), precludes petitioner "from disavowing the form of the Atrium sale/leaseback because the taxpayer's actions do not reflect an honest and consistent respect for the transaction's putative

---

[11]    We decline respondent's invitation to reconsider our position and to adopt the rule.

substance."   In Estate of Weinert, the Court of Appeals for the

Fifth Circuit (the Fifth Circuit) stated:

> Resort to substance is not a right reserved for
> the Commissioner's exclusive benefit, to use or not to
> use--depending on the amount of the tax to be realized.
> The taxpayer too has a right to assert the priority of
> substance--at least in a case where his tax reporting
> and actions show an honest and consistent respect for
> the substance of a transaction.  * * *  [Id. at 755.]

Respondent principally cites Illinois Power Co. v. Commissioner,

87 T.C. 1417 (1986), as demonstrating the circumstances in which

this Court shall apply what respondent calls the "Weinert rule"

(respondent's Weinert rule).  Petitioner argues that respondent's

Weinert rule is a "misrepresentation of the holding in Weinert."

We believe that respondent's Weinert rule is an offshoot of

the Fifth Circuit's statement in Estate of Weinert.  The Fifth

Circuit did not state that a taxpayer can argue the priority of

substance only if his tax reporting and other actions show an

honest and consistent respect for the substance of a transaction,

but rather, that a taxpayer can argue substance over form at

least when those conditions are met.  In other words, the Fifth

Circuit statement does not make honest and consistent respect for

the substance of a transaction in tax reporting and other actions

the sine qua non of a taxpayer's right to disavow the form of a

transaction.

We note, however, that this Court in Illinois Power Co. v.

Commissioner, supra, applied respondent's Weinert rule and did

not allow a taxpayer to disavow the form of a gift transaction

because "for tax reporting and other purposes, * * * [the taxpayer] consistently treated the transfer as a gift." Id. at 1431. This Court, pursuant to the doctrine enunciated in Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), followed what it perceived to be the principles established in Comdisco, Inc. v. United States, 756 F.2d 569, 578 (7th Cir. 1985). Nothing in Comdisco, however, makes honest and consistent respect for the substance of a transaction in tax reporting and other actions a condition precedent to a taxpayer's right to disavow the form of a transaction. Indeed, the Court of Appeals for the Seventh Circuit quoted Estate of Weinert v. Commissioner, supra at 755, and applied the reasoning and rule expressed in that case, without expanding or altering the Fifth Circuit's statement. Comdisco, Inc. v. United States, supra at 578. If honest and consistent respect for the substance of a transaction were a precondition to a taxpayer's disavowing the form of a transaction, the Danielson rule or our own "strong proof" standard, see, e.g., Meredith Corp. & Subs. v. Commissioner, supra at 438 ("strong proof" required to show that an allocation of consideration is other than that specified in a contract), would be beside the point in any case where such condition was not met. We have not, however, gone that far, but have listed the taxpayer's honest and consistent respect for the substance of a transaction in tax reporting and other actions as but one of at least four factors to be considered in determining

whether a taxpayer may disavow the form he has chosen.  Estate of
Durkin v. Commissioner, 99 T.C. at 574-575 (explaining
application of Danielson rule and strong proof standard to facts
of that case).  In any case in which the taxpayer fails to show
an honest and consistent respect for the substance of a
transaction, it may be difficult (if not impossible) for the
taxpayer to convince a court that he should be allowed to disavow
his chosen form, but we cannot say that, as a rule of law, he is
precluded from trying.[12]  Respondent's Weinert rule is too broad;
the taxpayer's lack of an honest and consistent respect for the
substance of a transaction may be an important (indeed, even
decisive) factor in determining that the taxpayer cannot disavow
his chosen form; it is not, however, a sufficient factor.  See
infra sec. II.D.3.e.

     d.  Estate of Durkin v. Commissioner

---

[12]     In Federal Natl. Mortgage Association v. Commissioner,
90 T.C. 405, 426-428 (1988), affd. 896 F.2d 580 (D.C. Cir. 1990),
we set forth two grounds for not allowing the taxpayer to disavow
the form of transaction reported on its original income tax
return and financial reports.  The first "more procedural" ground
was that the taxpayer's tax reporting and other actions did not
show an honest and consistent respect for what, at trial, it
claimed to be the substance of the transaction.  With respect to
the first ground, we said that we were "disinclined" to
recharacterize the transaction by hindsight.  The second ground
"[m]ore importantly" was that the form of the transaction
corresponded to its substance.  The Court of Appeals for the
District of Columbia Circuit affirmed our decision on the basis
of our substantive analysis.  Federal Natl. Mortgage Association
v. Commissioner, 896 F.2d at 586.  Had the first ground been
sufficient, we would have had no reason to discuss the second
(more important) ground.

Respondent cites Estate of Durkin v. Commissioner, supra at 571-575, and argues that this Court looked to three factors to determine whether a taxpayer could disavow the form of its transaction:

> (1) whether the taxpayer seeks to disavow its own return treatment of the transaction, (2) whether following the rationale of Weinert, the taxpayer's tax reporting and actions show and [sic] honest and consistent respect for the transaction, (3) whether the taxpayer is unilaterally attempting to have the transaction treated differently after it has been challenged.  * * *

We disagree with respondent that the rationale of Estate of Durkin can be so easily distilled.  In any event, we need not rely on Estate of Durkin because of the peculiar facts of this case.

### e. Petitioner May Not Disavow the Form of the 1988 Atrium Transaction

This Court has previously stated that a "taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted."  Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973).  That freedom is further curtailed if a taxpayer attempts to abandon its tax return treatment of a transaction. See, e.g., Halstead v. Commissioner, 296 F.2d 61, 62 (2d Cir. 1961), affg. per curiam T.C. Memo. 1960-106; Maletis v. United States, 200 F.2d 97, 98 (9th Cir. 1952);[13] see also supra secs.

---

[13]     In Maletis, the Court of Appeals for the Ninth Circuit stated as follows:

(continued...)

II.D.3.c. and d. (discussing Estate of Weinert v. Commissioner, 294 F.2d 750 (5th Cir. 1961), and Estate of Durkin v. Commissioner, supra, respectively).  Furthermore, when a taxpayer seeks to disavow its own tax return treatment of a transaction by asserting the priority of substance only after the Commissioner raises questions with respect thereto, this Court need not entertain the taxpayer's assertion of the priority of substance. See, e.g., Legg v. Commissioner, 57 T.C. 164, 169 (1971), affd. per curiam 496 F.2d 1179 (9th Cir. 1974).

In Legg, the taxpayers sold an apple orchard for $140,000, received a downpayment of $20,000 and an installment obligation, and elected to report the transaction on the installment method. Id. at 167-168.  Contemporaneously with that transaction, the taxpayers executed an irrevocable trust, funded with the installment obligation.  Id. at 168.  The Commissioner asserted that the transfer of the installment obligation to the trust was a disposition giving rise to gain.  Id.  The taxpayers argued to

---

(...continued)
        The Bureau of Internal Revenue, with the
    tremendous load it carries, must necessarily rely in
    the vast majority of cases on what the taxpayer asserts
    to be fact.  The burden is on the taxpayer to see to it
    that the form of business he has created for tax
    purposes, and has asserted in his returns to be valid,
    is in fact not a sham or unreal.  If in fact it is
    unreal, then it is not he but the Commissioner who
    should have the sole power to sustain or disregard the
    effect of the fiction since otherwise the opportunities
    for manipulation of taxes are practically unchecked.
    * * *  [Maletis v. United States, 200 F.2d 97, 98 (9th
    Cir. 1952).]

the Court "that since the sale and the creation of the trust
transpired simultaneously, the transaction in substance was a
sale consisting of a $20,000 downpayment and a lifetime
remuneration of $6,000 per year", which transaction would not
result in gain on the disposition of an installment obligation.
Id. at 169.  In response, this Court stated as follows:

> The petitioners' first contention has little or no
> justification in light of the fact that the form of the
> transaction was contemplated and carried out by the
> petitioners; it was their decision to report the sale
> on the installment basis.  A taxpayer cannot elect a
> specific course of action and then when finding himself
> in an adverse situation extricate himself by applying
> the age-old theory of substance over form.  [Id.]

Similarly, in this case, petitioner structured the 1988
Atrium Transaction as a sale by LBC of a 48-percent interest in
the Atrium Property to ARICO for $17,100,000 and a lease of the
Atrium Land by UBD from LBC and LAL.  On its Federal income tax
return for the taxable year 1988, the UBC affiliated group
reported a gain of $3,803,496 on that sale, and, on its Federal
income tax returns for the taxable years 1989 through 1991, the
UBC affiliated group took deductions for rental expenses on
account of the Atrium Lease.  In addition, after 1988, the
depreciation deductions claimed with respect to the Skyway and
that portion of the Atrium Structure placed in service prior to
1989 were computed on 51.5152 percent of the assets' cost bases.
As late as April 22, 1993, petitioner did not disavow its tax
return treatment of the 1988 Atrium Transaction.  Indeed,
petitioner apparently does not dispute respondent's assertion

that petitioner claimed that the substance of the 1988 Atrium Transaction was something other than its form only after respondent, as a protective measure in response to the basis allocation argument set forth in supra section II.B., reduced to zero the adjusted basis of the 48-percent interest in the Atrium sold by LBC.[14]

Under these circumstances, we shall not allow petitioner to disavow the form and tax treatment of the 1988 Atrium Transaction. Essentially, the timing of petitioner's recharacterization of the 1988 Atrium Transaction gives this Court very little confidence in embarking upon a burdensome search for the substance of that transaction. Although there exists the possibility that our approach may forsake the true substance of the 1988 Atrium Transaction, that is a risk that this Court can bear in light of petitioner's actions. To allow petitioner to assert the priority of substance in this case would only embroil this Court in petitioner's post-transactional tax planning. We decline that invitation.

4. Conclusion

Petitioner may not disavow the form of the 1988 Atrium Transaction.

---

[14] Our resolution of the issue presented in supra sec. II.B. leaves respondent without the need to make any protective adjustment with respect to the adjusted basis of the 48-percent interest in the Atrium sold by LBC. We assume, therefore, that respondent would seek only to maintain the UBC affiliated group's treatment of the 1988 Atrium Transaction as reported on its tax returns.

III.  Corporate Minimum Tax Issue

    A.  Introduction

On its consolidated returns since at least 1976, and continuing through 1986, the UBC affiliated group computed its tax under section 56(a), if any, based on a "consolidated" computation of that tax (UBC's method), see infra sec. III.C.1. In the notice of deficiency for docket No. 3723-95, respondent accepted and used UBC's method in computing the tax under section 56(a) (the corporate minimum tax) for the UBC affiliated group's 1977, 1980, 1984, and 1985 taxable years.  In the petition filed in docket No. 3723-95, petitioner claims that it is entitled to calculate the corporate minimum tax for the UBC affiliated group's 1977, 1980, 1984, and 1985 taxable years on a separate return basis (petitioner's method), see infra sec. III.C.2.,[15] and claims refunds for those years on that basis.

    B.  The Corporate Minimum Tax Provisions

The corporate minimum tax provisions, as in effect for the years in issue, are sections 56, 57, and 58, and the regulations thereunder.  Section 56 provides, in part, as follows:

SEC. 56 ADJUSTMENTS IN COMPUTING ALTERNATIVE MINIMUM TAXABLE INCOME.

    (a)  General Rule.--In addition to the other taxes imposed by * * * [chapter one of subtitle A of the Code], there is hereby imposed for each taxable year, with respect to the income of every corporation, a tax

---

[15]  It should be noted that, during those years in issue, no member of the UBC affiliated group actually filed separate tax returns.

equal to 15 percent of the amount by which the sum of the items of tax preference[16] exceeds the greater of--
> (1) $10,000, or
> (2) the regular tax deduction for the taxable year (as determined under subsection (c)).

> *   *   *   *   *   *   *

(c) Regular Tax Deduction Defined.--For purposes of this section, the term "regular tax deduction" means an amount equal to the taxes imposed by * * * [chapter one of subtitle A of the Code] for the taxable year (computed without regard to this part and without regard to the taxes imposed by sections 531 and 541), reduced by the sum of the credits allowable under subparts A, B, and D of part IV.  * * *[17]

C.  The Two Methods

1.  UBC's Method

Under UBC's Method, which respondent contends is correct, each member of the UBC affiliated group first determines its separate "items of tax preference" pursuant to section 57.  Then, each member's separate items of tax preference are aggregated to establish the UBC affiliated group's total for items of tax preference (UBC's total preferences).  That total is reduced by the UBC affiliated group's regular tax liability (the amount that should appear on Schedule J of its return) (UBC's consolidated regular tax) or, if there is no such liability, the minimum tax exemption.[18]  The 15 percent minimum tax rate of section 56(a) is

---

[16]   Items of tax preference are set forth in sec. 57.

[17]   The quoted provisions were in effect for the UBC affiliated group's 1985 taxable year.  For purposes of this case, prior versions of sec. 56, in effect for 1977, 1980, and 1984, were not materially different from the 1985 version.

[18]   This sentence reflects a stipulation of the parties.  We
(continued...)

then applied to the excess, if any, of UBC's total preferences over UBC's consolidated regular tax or the exemption amount. The resulting figure is the UBC affiliated group's corporate minimum tax.

2. Petitioner's Method

Under petitioner's method, each member of the UBC affiliated group first determines its separate items of tax preference pursuant to section 57. Then, each member's separate regular tax deduction under section 56(c) (separate regular tax deduction) is determined by using the method of allocation provided in sections 1552(a)(2) and 1.1502-33(d)(2)(ii), Income Tax Regs. (the 1502-33(d) allocation).[19] The 15-percent minimum tax rate of section

---

[18](...continued)
believe that the minimum tax exemption amount would be used if the consolidated regular tax were greater than zero and less than $10,000.

[19]  Sec. 1552(a) provides that, pursuant to regulations prescribed by the Secretary, the earnings and profits of each member of an affiliated group, see sec. 1504, required to be included in a consolidated return for such group filed for a taxable year shall be determined by allocating the tax liability of the group for such year among the members of the group in accordance with one of several methods set forth in sec. 1552(a)((1) through (4)), which method must be elected in the first consolidated return filed by the group. Beginning with its 1967 taxable year, the UBC affiliated group elected to allocate its consolidated regular tax liability among its members in accordance with sec. 1552(a)(2) and sec. 1.1502-33(d)(2)(ii), Income Tax Regs. Sec. 1552(a)(2) provides:

> The tax liability of the group shall be allocated to the several members of the group on the basis of the percentage of the total tax which the tax of such member if computed on a separate return would bear to the total amount of the taxes for all members of the group so computed.

(continued...)

56(a) is then applied to the excess of each member's separate items of tax preference over the amount, if any, determined under the 1502-33(d) allocation.  Each member's resulting minimum tax, if any, is then aggregated to derive the UBC affiliated group's corporate minimum tax.

Under petitioner's method, the aggregate of the members' separate regular tax deductions, which will be utilized by the UBC affiliated group to reduce items of tax preference subject to the 15-percent minimum tax, will not equal the consolidated regular tax liability of the group.  That lack of equivalence is a result of the following:  (1) Loss companies are not allocated any portion of the consolidated regular tax liability, which results

(...continued)
Sec. 1.1502-33(d)(2)(ii), Income Tax Regs., provides:

> (ii)(a) The tax liability of the group, as determined under paragraph (b)(1) of §1.1552-1, shall be allocated to the members in accordance with paragraph (a)(1), (2) or (3) of §1.1552-1, whichever is applicable;
> (b) An additional amount shall be allocated to each member equal to a fixed percentage (which does not exceed 100 percent) of the excess, if any, of (1) the separate return tax liability of such member for the taxable year (computed as provided in paragraph (a)(2)(ii) of §1.1552-1), over (2) the tax liability allocated to such member in accordance with (a) of this subdivision (ii); and
> (c) The total of any additional amounts allocated pursuant to (b) of this subdivision (ii) (including amounts allocated as a result of a carryback) shall be credited to the earnings and profits of those members which had items of income, deductions, or credits to which such total is attributable pursuant to a consistent method which fairly reflects such items of income, deductions, or credits, and which is substantiated by specific records maintained by the group for such purpose.

in no separate regular tax deduction for such members with separately computed items of tax preference; (2) the separately computed items of tax preference are not aggregated on a consolidated basis; and (3) the aggregate amount allocated under the 1502-33(d) allocation to members with positive taxable income may exceed the consolidated regular tax liability of the group.[20]

D. <u>Analysis</u>

1. <u>Issue</u>

The issue is whether petitioner is entitled to refunds of payments made to satisfy the UBC affiliated group's corporate minimum tax liabilities for the years in issue.

---

[20] That description of the consequence of petitioner's method is based on a stipulation of the parties. We find it somewhat confusing. We believe that the primary reason that the aggregate of the amounts allocated under the 1502-33(d) allocation may exceed the consolidated regular tax liability of the group is sec. 1.1502-33(d)(2)(ii)(b), Income Tax Regs., which allows for an allocation of additional amounts no greater than the excess of the separate return tax liability over the amount allocated in accordance with the ratio of separate return tax liability to the aggregate thereof for the group. For example, assume the following: (1) The consolidated group comprises A, B, and C; (2) A has taxable income of $100, B has taxable income of $100, and C has a loss of $40; and (3) the regular tax rate is 35 percent. The consolidated regular tax liability would equal $56 (35 percent of $160 (consolidated regular taxable income)). Under petitioner's method, both A and B would be allocated 50 percent of that amount because the ratio under sec. 1.1502-33(d)(2)(ii)(a), Income Tax Regs., for both is $35:$70, see sec. 1.1552-1(a)(2), Income Tax Regs., (we assume that the separate return tax liability of the loss corporation is zero; if negative, then A & B's ratios would only increase, resulting in greater initial allocations to A & B anyway); thus both A and B are allocated $28. But sec. 1.1502-33(d)(2)(ii)(b), Income Tax Regs., allows an allocation of an additional amount that is no greater than $7 ($35 - $28), which could result in a total allocation to A & B of $70. Seventy dollars is greater than the consolidated regular tax liability of $56.

## 2. Arguments of the Parties

Relying principally on Gottesman & Co. v. Commissioner, 77 T.C. 1149 (1981), petitioner argues that, in the absence of any contrary guidance in the Code or regulations thereunder, section 56(a) imposes a minimum tax on every corporation and that the UBC affiliated group must, therefore, compute its corporate minimum tax by aggregating the tax imposed under section 56(a) on each member of the group. Petitioner argues that, in calculating each member's separate corporate minimum tax, it is entitled to adopt any reasonable method of determining each member's separate regular tax deduction under section 56(c), in particular the 1502-33(d) allocation. Petitioner goes so far as to argue that petitioner is required to use the 1502-33(d) allocation for determining the separate regular tax deductions of the UBC affiliated group's members under section 56(c). Petitioner argues that, for the years in issue, the amount of the UBC affiliated group's corporate minimum tax under petitioner's method is less than the tax under UBC's method and, therefore, petitioner is entitled to a refund for those years.

Respondent acknowledges that the regulations relating to consolidated returns (the consolidated return regulations)[21] do not directly address the computation of the corporate minimum tax for groups filing consolidated returns. Respondent argues, however, that under the general rule of section 1.1502-80, Income Tax Regs.,

---

[21]     See secs. 1.1501-1 through 1.1552-1, Income Tax Regs.

the minimum tax liability of the UBC affiliated group is determined by the Code or other law otherwise applicable.  Thus, respondent contends that section 56(a)(2) and (c), the legislative history thereof, and certain case law remain applicable, requiring the regular tax deduction of the UBC affiliated group under section 56(c) to equal the amount of tax <u>actually</u> imposed on the group under chapter one of subtitle A of the Code for the taxable year (without regard to the corporate minimum tax and certain other provisions).  Respondent argues that, under petitioner's method, the aggregate of the members' separate regular tax deductions will not equal UBC's consolidated regular tax.  Moreover, respondent argues, petitioner's method reduces the UBC affiliated group's corporate minimum tax only if the total of the members' separate regular tax deductions exceeds UBC's consolidated regular tax.  Respondent states:  "Consequently, if the Court limits the total `regular tax deduction' to the UBC group's consolidated regular tax liability, petitioner's overpayment claims become moot and resolution of the Separate Return Issue unnecessary."  In other words, we need not determine the proper method of calculating the corporate minimum tax in the context of corporations filing consolidated returns if we decide that the deduction under section 56(c) for an affiliated group of corporations filing a consolidated return is limited to the tax <u>actually</u> imposed on such group under chapter one of subtitle A of the Code for the taxable year (without regard to the corporate minimum tax and certain other provisions and reduced by the sum of certain credits) (the actually imposed chapter one tax).

### 3. Discussion

Initially, the dispute between the parties seems to involve two countervailing principles of the law relating to consolidated returns: (1) "`Each corporation is a separate taxpayer whether it stands alone or is in an affiliated group and files a consolidated return'", Wegman's Properties, Inc. v. Commissioner, 78 T.C. 786, 789 (1982) (quoting Electronic Sensing Prods., Inc. v. Commissioner, 69 T.C. 276, 281 (1977)), and (2) "the purpose of the consolidated return provisions * * * is `to require taxes to be levied according to the true net income and invested capital resulting from and employed in a single business enterprise, even though it was conducted by means of more than one corporation'", First Natl. Bank in Little Rock v. Commissioner, 83 T.C. 202, 209 (1984) (quoting Handy & Harman v. Burnet, 284 U.S. 136, 140 (1931)). The nature of petitioner's refund claim with respect to the UBC affiliated group's corporate minimum tax liabilities, however, allows us to restrict our analysis to the centerpiece of the parties' dispute, i.e., the amount of the deduction under section 56(c) for an affiliated group of corporations. In other words, if we decide that the deduction under section 56(c) for an affiliated group of corporations is limited to its actually imposed chapter one tax, the parties will have no material disagreement in their computations pursuant to Rule 155 regarding the UBC affiliated group's corporate minimum tax liabilities for the years in issue. Therefore, we shall first address that issue.

Section 1501 provides, in part, as follows:

An affiliated group of corporations shall * * * have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. * * *

Pursuant to section 1502, Congress has granted to the Secretary of the Treasury broad authority to prescribe such regulations as he may deem necessary with respect to the making of consolidated returns. There are no regulations, however, that directly address the calculation of the corporate minimum tax for an affiliated group of corporations that makes a consolidated return.[22] In the absence of consolidated return regulations governing a particular point, this Court shall look to the Code or other law. See, e.g., Wegman's Properties, Inc., & Subs. v. Commissioner, supra at 790; sec.

---

[22] On Mar. 19, 1970, the Internal Revenue Service (the IRS) issued Technical Information Release No. 1032, which stated, in part, as follows:

The Internal Revenue Service today announced that amendments will be made to the regulations to reflect the effect on consolidated returns and partnerships of the addition by the Tax Reform Act of 1969 of the minimum tax for tax preferences.

The amendment relating to consolidated returns will make clear that the election by affiliated groups of corporations to file a consolidated Federal income tax return is effective with respect to the computation of the minimum tax as well as the regular income tax.

Those amendments, however, were never made. On July 31, 1984, the IRS issued, but never finalized, a proposed amendment to sec. 1.1502-2, Income Tax Regs., which would have added the corporate minimum tax to the list of taxes to be computed as part of an affiliated group's consolidated tax liability.

1.1502-80, Income Tax Regs.

Section 56(a) imposes, with respect to the income of every corporation, a tax equal to 15 percent of the excess of the sum of the items of tax preference over the greater of $10,000 or the regular tax deduction.[23]  Section 56(c) defines the term "regular tax deduction" to mean "an amount equal to the taxes imposed" by chapter one of subtitle A of the Code for the taxable year (computed without regard to the corporate minimum tax and certain other provisions), reduced by the sum of certain credits.  In Norwest Corp. & Subs. v. Commissioner, T.C. Memo. 1995-600, which involved the same Norwest Corp. that is the successor in interest to the UBC affiliated group in this case, this Court held that the amount of the section 56(c) deduction for an affiliated group of corporations is limited to the actually imposed chapter one tax of the affiliated group.  That holding was based primarily on the rationale of Sparrow v.

_____

[23]    One court has stated that the purpose of the corporate minimum tax "is to make sure that the aggregating of tax-preference items does not result in the taxpayer's paying a shockingly low percentage of his income as tax."  First Chicago Corp. v. Commissioner, 842 F.2d 180, 181 (7th Cir. 1988), affg. 88 T.C. 663 (1987).  This Court in First Natl. Bank in Little Rock v. Commissioner, 83 T.C. 202, 214 (1984), examined the legislative history of the corporate minimum tax and distilled two general principles:

> First, the tax was intended to limit the tax benefits and advantages from certain tax exemptions and special deductions referred to as tax preference items.  * * * Second, Congress did not undertake a revision of the Code provisions granting the tax preferences or other substantive provisions such as the consolidated return regulations.  Instead, liability for this additional tax is generally to be measured by the provisions imposing it.

Commissioner, 86 T.C. 929 (1986).

In Sparrow, the taxpayers argued that the regular tax for purposes of calculating their alternative minimum tax under section 55 was the tax that would have been imposed under section 1 and not the lesser amount of tax that was actually imposed with the benefit of the income averaging provisions of sections 1301-1305. This Court stated:

> section 55(b)(2) (now section 55(f)(2)) defines regular tax as "the taxes imposed by this chapter for the taxable year." (Emphasis added.) "This chapter" is Chapter 1 of Subtitle A of the Code. It encompasses sections 1 through 1397. Thus, the regular tax includes the taxes imposed by sections 1 through 1397; in particular, the tax imposed by section 1. However, section 1301 allows a taxpayer to reduce the tax on averageable income thereunder. The amount so determined under section 1301 thus becomes the tax imposed by section 1. Sec. 1301 * * *. This figure therefore is the regular tax and must be used in computing the alternative minimum tax.
>
> * * * Petitioners would have us read section 55(b)(2) (now section 55(f)(2)) as defining regular tax as the tax computed under section 1 regardless of the tax actually imposed thereunder. This we cannot do. The statutory language is "taxes imposed." [Sparrow v. Commissioner, supra at 934-935.]

Similarly, section 1.1502-2, Income Tax Regs., provides that the tax liability of an affiliated group of corporations is determined by adding together the taxes imposed under various sections of chapter one of subtitle A of the Code on the group's consolidated taxable income for the taxable year; the total of the taxes so determined is equal to the taxes imposed on an affiliated group under chapter one of subtitle A of the Code. No other taxes are imposed on an affiliated group or any of its separate members under chapter one of subtitle A of the Code. Therefore, the

deduction under section 56(c) for an affiliated group is limited initially to <u>an amount equal to</u> the amount determined pursuant to section 1.1502-2, Income Tax Regs., which regulation provides a computation of the amount of taxes imposed on an affiliated group under chapter one of subtitle A of the Code.

The 1502-33(d) allocation advanced by petitioner, however, would require us to read section 56(c) as defining the term "regular tax deduction" to mean an amount of tax that is not actually imposed by chapter one of subtitle A of the Code. That we cannot do. The statutory language is "taxes imposed". The 1502-33(d) allocation is a method of allocating the tax liability determined pursuant to section 1.1502-2, Income Tax Regs., for purposes of determining the earnings and profits of each member of an affiliated group. See sec. 1552; secs. 1.1552-1(a) and (b)(1), 1.1502-33(d)(2), Income Tax Regs. The amounts allocated to each member of an affiliated group under the 1502-33(d) allocation are certainly derived from and <u>may</u> in the aggregate equal the amount of taxes imposed on the affiliated group pursuant to chapter one of subtitle A of the Code for the taxable year, but are not, themselves, taxes so imposed. The fact that section 1.1552-1(b)(2)(ii), Income Tax Regs., <u>treats</u> the amounts allocated under the 1502-33(d) allocation as a liability of each member of the affiliated group does not convert such amounts into taxes <u>imposed</u> by chapter one of subtitle A of the Code for purposes of section 56(c).[24]

---

[24]  Petitioner's argument that the 1502-33(d) allocation is used
(continued...)

Petitioner's reliance on Gottesman & Co. v. Commissioner, 77 T.C. 1149 (1981), is misplaced.  In Gottesman, this Court held that, since the consolidated return regulations did not mandate a consolidated calculation of the accumulated earnings tax under section 531, the taxpayer was permitted to use a separate company calculation.  In this case, however, petitioner seeks to adopt a method that is contrary to an express provision of the Code, section 56(c).  Gottesman is inapposite.

In light of our analysis, we believe that petitioner's other arguments do not merit discussion.  In conclusion, the deduction under section 56(c) for an affiliated group of corporations is limited to the group's actually imposed chapter one tax, and, therefore, petitioner's claims for refunds must fail.

E.  Conclusion

Petitioner is not entitled to refunds of payments made to satisfy the UBC affiliated group's corporate minimum tax liabilities for the years in issue.

IV.  Furniture and Fixtures Recovery Period Issue

A.  Introduction

We must determine the applicable recovery period for certain furniture and fixtures (the furniture and fixtures) placed in service by various members of the UBC affiliated group during the group's 1987, 1988, and 1989 taxable years.  The applicable recovery

---

[24](...continued)
for other purposes, such as the addition to tax under sec. 6655(a), does not change our conclusion that the amounts derived from such allocation are not taxes imposed by chapter one of subtitle A of the Code.

period is an element in the calculation of the deduction for depreciation allowed by section 167. The parties disagree as to whether the recovery period applicable to the furniture and fixtures is 5 years or 7 years. Petitioner argues that it is 5 years, while respondent argues that it is 7 years. UBC originally determined that the recovery period applicable to the furniture and fixtures was 7 years and applied that period to the furniture and fixtures in making its consolidated returns for 1987, 1988, and 1989. In the relevant petitions, petitioner avers that UBC's original determination of the applicable recovery period was mistaken, and that the correct applicable recovery period is 5 years. Petitioner asks that the Court determine an overpayment in tax on account of that mistake. The aggregate cost bases for the furniture and fixtures placed in service in 1987, 1988, and 1989 are $5,710,643, $1,490,930, and $546,707, respectively.

The parties disagree as to whether a similar question is before the Court with respect to the UBC affiliated group's 1990 and (short) 1991 taxable years. During those years, various members of the UBC affiliated group placed in service additional furniture and fixtures (the 1990-91 furniture and fixtures). UBC determined that the recovery period applicable to the 1990-1991 furniture and fixtures was 5 years and applied that period to those furniture and fixtures in making its consolidated returns for 1990 and 1991. Respondent made no adjustment with respect to that determination. In the relevant petition, petitioner included the 1990-91 furniture and fixtures with the furniture and fixtures in its averment that

UBC had mistakenly used a 7-year recovery period. In the answer, respondent merely denied petitioner's averment. In their respective trial memoranda, neither party identified the discrepancy in treatment between the furniture and fixtures and the 1990-91 furniture and fixtures. In their stipulations, however, the parties recognize the discrepancy, and petitioner concedes that it is not entitled to any additional depreciation with respect to the 1990-91 furniture and fixtures. On brief, petitioner argues that the only applicable recovery period issue before the Court concerns the furniture and fixtures. Respondent argues that the Court must also determine the applicable recovery period with respect to the 1990-91 furniture and fixtures because that issue either (1) was put in issue by the petition or (2) was tried with consent of the parties.

We do not believe that petitioner intended to put into issue the applicable recovery period with respect to the 1990-91 furniture and fixtures, nor do we believe that that issue was tried with petitioner's consent. Rule 31(d) requires us to construe all pleadings to do substantial justice. Substantial justice would not be done were we to hold petitioner to an unintended construction of its pleading, especially in light of respondent's uninformative response. Clearly, the issue was not tried with petitioner's consent in light of the stipulation and the lack of any notice by respondent that he intended to raise the issue. The parties have relied only on the stipulated facts in briefing this issue, so we cannot conclude that petitioner failed to object to evidence that should have put petitioner on notice that the applicable recovery

period with respect to the 1990-91 furniture and fixtures had been put into play by respondent. Section 6214 provides us with jurisdiction to determine an increased deficiency if a claim therefor is asserted by the Secretary at or before the hearing. Respondent has not relied on section 6214, so we assume that respondent does not argue that he asserted a timely, appropriate claim. We conclude that the recovery period applicable to the 1990-91 furniture and fixtures is not before the Court for decision.

B. Applicable Recovery Period; Class Life

Section 168(c) provides that the applicable recovery period of 5-year property is 5 years and the applicable recovery period of 7-year property is 7 years. Section 168(e)(1) generally defines 5-year property as property having a class life of more than 4 years, but less than 10 years, and 7-year property as property having a class life of 10 years or more, but less than 16 years. "Class life", as defined by section 168(i)(1), is determined by reference to former section 167(m), as in effect prior to its repeal by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11812(a), 104 Stat. 1388, 1388-534. Section 167(m) provided for a depreciation allowance based upon the class life prescribed by the Secretary of the Treasury or his delegate. The class lives of depreciable assets can be found in a series of revenue procedures issued by the Commissioner. See sec. 1.167(a)-11(b)(4)(ii), Income Tax Regs. The revenue procedure in effect for the years in issue in this case is Rev. Proc. 87-56, 1987-2 C.B. 674 (Rev. Proc. 87-56). Rev. Proc. 87-56 divides assets into two broad categories: (1)

Asset guideline classes 00.11 through 00.4, consisting of specific depreciable assets used in all business activities (the asset category), and (2) asset guideline classes 01.1 through 80.0, consisting of depreciable assets used in specific business activities (the activity category).  The specific asset guideline classes in issue are asset guideline classes 00.11 and 57.0 (classes 00.11 and 57.0, respectively).  Classes 00.11 and 57.0, and their headings, are as follows:

SPECIFIC DEPRECIABLE ASSETS USED IN ALL BUSINESS ACTIVITIES, EXCEPT AS NOTED:

00.11      Office Furniture, Fixtures, and Equipment:
           Includes furniture and fixtures that are not a
           structural component of a building. Includes
           such assets as desks, files, safes, and
           communications equipment. Does not include
           communications equipment that is included in
           other classes  * * *

           *    *    *    *    *    *    *

DEPRECIABLE ASSETS USED IN THE FOLLOWING ACTIVITIES:

           *    *    *    *    *    *    *

57.0       Distributive Trades and Services:
           Includes assets used in wholesale and retail
           trade, and personal and professional services.
           Includes section 1245 assets used in marketing
           petroleum and petroleum products  * * *

Rev. Proc. 87-56 at 676, 686.  The class lives specified for classes 00.11 and 57.0 are 10 and 9 years, respectively.

If the furniture and fixtures are described in class 00.11, they have a class life of 10 years and, by virtue of section 168(e)(1), are 7-year property, with an applicable recovery period of 7 years.  See sec. 168(c)(1).  If the furniture and fixtures are described in class 57.0, they have a class life of 9 years and, by

virtue of section 168(e)(1), are 5-year property, with a applicable recovery period of 5 years.  See id.

C.  Arguments of the Parties

The parties agree that the applicable recovery period for the furniture and fixtures turns on whether the furniture and fixtures are described in class 00.11 or class 57.0.  Class 00.11 is in the asset category and class 57.0 is in the activity category.  It is clear that, at least in theory, the same item of depreciable property can be described in both the asset category and the activity category.  See, e.g., Rev. Proc. 87-56 (class 35.0, excluding assets in class 00.11 through 00.4).  Petitioner, explicitly, and respondent, implicitly, agree that the furniture and fixtures are described in both class 00.11 and 57.0.  They disagree, however, on the classification that takes priority.

Petitioner argues that (1) logic and precedent require that the particular (class 57.0) should prevail over the general (class 00.11), (2) legislative and administrative history support that result, and (3) a recent ruling of the Commissioner's, Rev. Rul. 95-52, 1995-2 C.B. 27, amounts to a concession by the Commissioner with respect to the issue before us.  Respondent relies on (1) the "plain language" of Rev. Proc. 87-56, (2) administrative history, and (3) our decision in Norwest Corp. & Subs. v. Commissioner, T.C. Memo. 1995-390.

D.  Discussion

In Norwest Corp. & Subs. v. Commissioner, T.C. Memo. 1995-390, we addressed the same issue presented in this case.  We held that

class 00.11 takes priority over class 57.0.  Petitioner argues that

that conclusion is wrong.  Petitioner argues that, in Norwest Corp.,

we failed adequately to analyze two cases:  Walgreen Co. & Subs. v.

Commissioner, 68 F.3d 1006 (7th Cir. 1995), revg. and remanding 103

T.C. 582 (1994), on remand T.C. Memo. 1996-374, and JFM, Inc. &

Subs. v. Commissioner, T.C. Memo. 1994-239.

The primary issue in Walgreen Co. was whether certain leasehold

improvements, currently described in class 57.0, were excluded from

class 50.0 (class 50.0) of Rev. Proc. 72-10, 1972-1 C.B. 721, 730

(Rev. Proc. 72-10), by virtue of being described in class 65.0

(class 65.0) of Rev. Proc. 72-10.  Class 65.0 is entitled "Building

Services" and includes, among other things, "the structural shells

of buildings and all integral parts thereof".  The Court of Appeals

for the Seventh Circuit (the Seventh Circuit) traced the provenance

of class 65.0 to an asset category, "Buildings", in Rev. Proc. 62-

21, 1962-2 C.B. 418, 419 (Rev. Proc. 62-21).  The Seventh Circuit

summarized the relevant aspects of Rev. Proc. 62-21 as follows:

> In 1962 the Internal Revenue Service prescribed useful
> lives both for types of asset and types of business. Rev.
> Proc. 62-21, 1962-2 Cum. Bull. 418.  One type of asset was
> "Buildings," defined as including "the structural shell of
> the building and all integral parts thereof."  One type of
> business was "Wholesale and Retail Trade." An asset might
> be a building used in wholesale and retail trade, and thus
> fall into two useful-lives groups.  To take care of such
> overlaps, Rev. Proc. 62-21 provided that an asset that
> fell within both an asset group and an activity group
> would be classified in the asset group.

Walgreen Co. & Subs. v. Commissioner, supra at 1007.  The Seventh

Circuit noted that, unlike Rev. Proc. 62-21, Rev. Proc. 72-10 did

not contain a priority rule.  Walgreen Co. & Subs. v. Commissioner,

supra at 1008.  The Government had based one of its arguments for
affirmance on the assumption that the old (Rev. Proc. 62-21)
priority rule remained in effect (i.e., that any asset described
both in class 50.0 and class 65.0 would be deemed to be only in
class 65.0, for which a longer useful life coincidentally had been
specified).  Walgreen had not challenged that assumption, and,
immediately after reviewing the evolution of the asset
classification system, the Seventh Circuit stated that it would
accept the assumption for purposes of deciding the appeal.  (The
Seventh Circuit remanded to the Tax Court to find whether any or all
of the leasehold improvements in question were excluded from class
50.0 by virtue of being described in class 65.0; we found that some
were and some were not.)

Petitioner makes the simplistic argument that, since the
Seventh Circuit stated that class 50.0 (now class 57.0) included all
assets used in wholesale or retail trade except those in class 65.0,
and the furniture and fixtures would not be in class 65.0, they must
be in class 57.0.  We do not draw that conclusion.  The priority
rule of Rev. Proc. 62-21 provided not only that the asset category
of buildings prevailed over the activity category of wholesale and
retail trade but also that the asset category that included office
furniture and fixtures likewise prevailed.  The consideration that
the Seventh Circuit gave to the evolution of the asset
classification system before accepting the assumption of the
Government as to the survival of the Rev. Proc. 62-21 priority rule
with respect to class 65.0 leads us to conclude that the Seventh

Circuit might have reached a similar conclusion even without the taxpayer's concession to the Government's assumption. We attach little significance to the language to which petitioner directs our attention. Walgreen Co. & Subs. v. Commissioner, supra, does not support petitioner's argument.

JFM, Inc. & Subs. v. Commissioner, supra, is also inapposite. In that case, among other things, we had to determine the classification under Rev. Proc. 87-56 of gasoline pump canopies and related assets. We determined that class 57.0 (and 57.1) specifically included gasoline pump canopies. We rejected the Commissioner's attempt to classify the assets under the broad definition of "Land Improvements" in class 00.3, on the basis that such class was a "catchall" provision, which specifically excluded assets "explicitly included" in other classes. Petitioner draws our attention to the following statement in JFM, Inc.: "It is clear that classes 57.0 and 57.1 were intended to cover all possible types of real or personal property used in marketing petroleum products". We made that statement in the context of rejecting the Commissioner's class 00.3 classification, which excludes assets described in other classes, and we do not read that statement as establishing any priority between class 57.0 and 00.11.

Petitioner also relies on Rev. Rul. 95-52, 1995-2 C.B. 27, arguing that it shows that the recovery period of furniture can be 5 years because, under the circumstances in the ruling, furniture is included in class 57.0. It is true that, in the ruling, the Commissioner held that some furniture is in class 57.0. The

furniture in question, however, was furniture described as "consumer durable property" (described in Rev. Proc. 95-38, 1995-2 C.B. 397, 398) subject to rent-to-own contracts entered into with individuals. The furniture was generally used in an individual's home. That furniture, thus, does not fall within class 00.11, which pertains to "Office Furniture, Fixtures, and Equipment".

Petitioner's argument that legislative and administrative history support its position is basically an argument that policy goals such as simplification and controversy avoidance would be served by holding that the activity category includes all depreciable property used in the named activities. Whether or not that may be true, but it is not the pattern of the classification system, which, in specific instances, excludes asset category items from the activity category. See, e.g., Rev. Proc. 87-56, classes 35.0, 37.11, 80.0. Rev. Proc. 87-56 also excludes from the asset category items described in the activity category, see, e.g., classes 00.12, 00.3, 00.4. We do not discern the absolute position that petitioner advocates in the history it has cited to us.

Petitioner's argument that the particular should prevail over the general is an argument based on common sense and general rules of construction. See, e.g., Wood v. Commissioner, 95 T.C. 364, 371 (1990) ("when Congress has dealt with a particular classification with specific language, the classification is removed from the application of general language"), revd. 955 F.2d 908 (4th Cir. 1992). Petitioner, however, has not persuaded us that, in this case, class 57.0 is the specific and class 00.11 is the general.

There are exceptions from the asset category for items classified in the activity category and vice versa. We are not convinced that the activity categorization of class 57.0 is more specific than the asset categorization of class 00.11 in the case of office furniture and fixtures. Petitioner's suggested rule of construction is of no help to it here.

Respondent argues that the plain language of Rev. Proc. 87-56 provides that the asset category consists of "Specific Business Assets Used in All Business Activities" and that the inclusive adjective, "all", plainly establishes a priority of asset categorization over activity categorization, except where a specific exception applies. We do not agree. The adjective "all" simply serves to define a class in the category; it does not help solve the priority question raised by a class in the activity category that, on its face, also includes the furniture and fixtures. Respondent also argues that his position is supported by the history of the asset depreciation guidelines. We have already discussed some of that history, but, at the risk of repeating ourselves, will set forth respondent's argument:

> Rev. Proc. 87-56's predecessors all grouped depreciable assets into the same two broad categories, specific assets used in all business activities and assets used in specific business activities. See, Rev. Proc. 83-35, 1983-1 C.B. 745; Rev. Proc. 77-10, 1977-1 C.B. 548; and Rev. Proc. 72-10, 1972-1 C.B. 721. Those revenue procedures were patterned after the first depreciation guideline revenue procedure, Rev. Proc. 62-21, 1962-2 C.B. 418. Rev. Proc. 62-21 provided for four groups of depreciable assets. The first group, corresponding to the asset category of Rev. Proc. 87-56, consisted of assets used by business in general. The second, third, and fourth groups, corresponding to the activity category of Rev. Proc. 87-56, consisted of assets used in non-

manufacturing activities, manufacturing activities, and transportation, communication, and public utilities, respectively.  Specifically excluded from the second, third, and fourth groups were any assets coming within the first group.  Although Rev. Proc. 87-56 and its immediate predecessors do not explicitly exclude from the activity category assets coming within the asset category, all continue the same pattern.[9]

[9]  The legislative history of ACRS indicates that Congress understood Rev. Proc. 87-56's predecessors as providing that assets which are encompassed in classes in both the asset and activity categories are to be classified in the asset class.  In describing the ADR system which was incorporated into ACRS, the Conference Committee Report on the Tax Reform Act of 1986 states: Under the ADR system, a present class life ("mid-point") was provided for all assets used in the same activity, other than certain assets with common characteristics (e.g., automobiles). H.R. Conf. Rep. No. 99-841, 99th Cong., 2d Sess. 38 (1986), 1986-3 C.B. Vol. 4, 38 (emphasis added) (automobiles comprised an asset category class (Class 00.22) under Rev. Proc. 83-35, 1983-1 C.B. 745).

We are not interpreting a statutory provision.  Although Congress clearly was concerned with the Commissioner's implementation of the class life system, and the system implements section 167, we are interpreting an administrative creation, and, thus, we must determine the administrator's intent.  We are persuaded by respondent that Rev. Proc. 62-21 established a pattern that was carried over into subsequent revenue procedures, including Rev. Proc. 87-56.  Notwithstanding the failure to continue a specific priority rule in subsequent revenue procedures, there is sufficient similarity in style and organization between Rev. Proc. 62-21 and its successors that we think that a similar priority rule was intended, and we so find.

E.  Conclusion

The furniture and fixtures are described in class 00.11.

Therefore, they have a class life of 10 years and, by virtue of section 168(e)(1), are 7-year property, with an applicable recovery period of 7 years. See sec. 168(c)(1).

V. Net Operating Loss Issue

    A. Introduction

Section 172(a) allows a "net operating loss deduction" for the aggregate of net operating loss carrybacks and carryovers to the taxable year. The term "net operating loss" (NOL) is defined in section 172(c). Section 172(b) provides the carryback and carryover periods for NOLs. Section 172(b)(1)(A) and (B) provides that, generally, the carryback period for a NOL is 3 years and the carryover period is 15 years. Section 172(b)(1)(L) provides a special rule with respect to the bad debt losses of commercial banks: The portion of the NOL of a commercial bank that is attributable to bad debt losses is prescribed a carryback period of 10 years and carryover period of 5 years. Section 172(l) provides a rule for determining the portion of a bank's NOL attributable bad debt losses:

> The portion of the net operating loss for any taxable year which is attributable to the deduction allowed under section 166(a) shall be the excess of --
>
>     (i) the net operating loss for such taxable year, over
>     (ii) the net operating loss for such taxable year determined without regard to the amount allowed as a deduction under section 166(a) for such taxable year.

Section 166 allows a deduction for bad debts. Section 1.1502-11, Income Tax Regs., prescribes how consolidated taxable income is to be determined. Among other things, it prescribes that consolidated

taxable income is to be determined by taking into account the separate taxable income of each member of the group and "[a]ny consolidated net operating loss deduction". Section 1.1502-21(a), Income Tax Regs., provides that the consolidated NOL deduction is equal to the aggregate of the consolidated NOL carryovers and carrybacks to the taxable year. In pertinent part, section 1.1502-21(b)(1), Income Tax Regs., provides that the consolidated NOL carryovers and carrybacks to the taxable year shall consist of any consolidated NOLs of the group that may be carried back or over to the taxable year under the provisions of section 172(b). Section 1.1502-21(f), Income Tax Regs., provides rules for determining the consolidated NOL. In pertinent part, it provides that the consolidated NOL shall be determined by taking into account the separate taxable income, "as determined under §1.1502-12", of each member of the group. Finally, section 1.1502-12, Income Tax Regs., provides that the separate taxable income of a member, "including a case in which deductions exceed gross income", is determined, with certain modifications, as if the member were not a member of the group.

The dispute between the parties concerns the calculation of that portion of the consolidated NOL of the UBC affiliated group for 1987 that is attributable to bank bad debt losses (and, thus, subject to the special carryback and carryforward rules of section 172(b)(1)(L)). For 1987, the UBC affiliated group consisted of both bank and nonbank members. The parties have no dispute over how to determine the bad debt portion of the NOL of any bank member. Their

dispute concerns the determination of the bank bad debt portion of the <u>consolidated</u> NOL.  We agree with respondent's determination.

B.    <u>Facts</u>

All of the facts relevant to this issue have been stipulated. In abbreviated form, those facts are as follows:

By Form 1139, Corporation Application for Tentative Refund (the Form 1139), dated November 18, 1988, UBC claimed tentative refunds for the taxable years 1977, 1978, 1979, 1981, 1984, and 1985 based on the carryback of a NOL from the UBC affiliated group's 1987 taxable year (the 1987 consolidated NOL).

UBC carried a portion of the consolidated 1987 NOL back to the UBC affiliated group's taxable years 1977, 1978, and 1981.

On the Form 1139, UBC calculated the portion of the consolidated 1987 NOL subject to the 10-year carryback provided for by section 172(b)(1)(L) (the bad debt portion) by (1) determining the bad debt and nonbad debt portions of each loss bank member's NOL, (2) allocating the consolidated 1987 NOL among the loss members and, in the case of loss bank members, between the bad debt and nonbad debt portions of their NOLs, and (3) aggregating the portions of the consolidated 1987 NOL allocated to the bad debt portions of the loss bank members' NOLs.

On the Form 1139, UBC determined the bad debt portion of each loss bank member's NOL by taking the excess of its NOL over its NOL less its bad debt deduction (i.e., an amount equal to the lesser of the bank's NOL or bad debt deduction).  Thus, for example, in the case of United Bank of Aurora-South (Aurora-South), a bank member

of the affiliated group, which had an NOL of $341,183 and a bad debt deduction of $136,881, the bad debt portion of the NOL was determined to be $136,881.

After determining the bad debt portion of each loss bank member's NOL, UBC allocated the consolidated 1987 NOL among the group's loss members and, in the case of the loss bank members, between the bad debt and the nonbad debt portions of their NOLs. The allocation was made in proportion to the aggregate of the loss members' NOLs. For example, $41,861 of the consolidated 1987 NOL was allocated to the bad debt portion of Aurora-South's NOL (The bad debt portion of Aurora South's NOL was $136,881; the consolidated NOL, as adjusted by respondent, was $9,239,383, and the aggregate of all loss members' NOLs, as adjusted by respondent was $38,752,008. So, $32,636 = $136,881 x (9,239,383 ÷ 38,752,008).) The sum of $48,710 of the consolidated 1987 NOL, as adjusted by respondent, was allocated to the nonbad debt portion of Aurora-South's NOL. (The nonbad debt portion of Aurora South's NOL was $204,302; $48,710 = $204,302 x (9,239,383 ÷ 38,752,008).)

After allocating the consolidated 1987 NOL among the loss members, UBC determined the bad debt portion of the consolidated 1987 NOL by aggregating the portions of the consolidated 1987 NOL allocated to the bad debt portions of the loss bank members' NOLs. The bad debt portion so determined was $8,731,874, of which $2,152,283 was attributable to separate return limitation year (SRLY) bank members and $6,579,591 was attributable to non-SRLY bank members. Based thereon UBC claimed consolidated 1987 NOL

carrybacks to the UBC consolidated group's taxable years 1977, 1978, and 1981 under the provisions of section 172(b)(1)(L) totaling $6,924,421 ($6,579,591 (non-SRLY bank members) + $344,830 (SRLY carryback to 1981)).

In respondent's notice of deficiency issued to petitioner for the UBC affiliated group's taxable years 1977 through 1980, 1984, and 1985 (the "notice"), respondent adjusted the consolidated 1987 NOL to take into account various proposed adjustments. As UBC did on the Form 1139, respondent calculated the bad debt portion of the consolidated 1987 NOL by (1) determining the bad debt and nonbad debt portions of each loss bank member's NOL, (2) allocating the consolidated 1987 NOL among the loss members and, in the case of loss bank members, between the bad debt and nonbad debt portions of their NOLs, and (3) aggregating the portions of the consolidated 1987 NOL allocated to the bad debt portions of the loss bank members' NOLs.

In the notice, respondent, like UBC on the Form 1139, determined the bad debt portion of each loss bank member's NOL by taking the excess of its NOL over its NOL less its bad debt deduction (i.e., an amount equal to the lesser of the bank's NOL or bad debt deduction). Thus, for example, in the case of Aurora-South, which had an NOL of $341,183 and a bad debt deduction of $136,881, the bad debt portion of the NOL was determined to be $136,881.

After determining the bad debt portion of each loss bank member's NOL, respondent, like UBC, allocated the consolidated 1987

NOL among the group's loss members and, in the case of the loss bank members, between the bad debt and the nonbad debt portions of their NOLs.  The allocation was made in proportion to the aggregate of the loss members' NOLs.  For example, $32,636 of the consolidated 1987 NOL (as adjusted by respondent) was allocated to the bad debt portion of Aurora-South's NOL.  The bad debt portion of Aurora-South's NOL was $136,881; the consolidated NOL, as adjusted by respondent, was $9,239,383, and the aggregate of all loss members' NOLs, as adjusted by respondent was $38,752,008.  Thus, $32,636 = $136,881 x (9,239,383 ÷ 38,752,008).  The sum of $48,710 of the consolidated 1987 NOL, as adjusted by respondent, was allocated to the nonbad debt portion of Aurora-South's NOL.  The nonbad debt portion of Aurora-South's NOL was $204,302; $48,710 = $204,302 x (9,239,383 ÷ 38,752,008).

After allocating the consolidated 1987 NOL among the loss members, respondent, in the notice, like UBC on the Form 1139, determined the bad debt portion of the consolidated 1987 NOL by aggregating the portions of the consolidated 1987 NOL allocated to the bad debt portions of the loss bank members' NOLs.  The bad debt portion so determined was $6,263,417, of which $1,677,978 was attributable to SRLY bank members and $4,585,439 was attributable to non-SRLY bank members.  Based thereon the notice allowed NOL carrybacks to the UBC affiliated group's taxable year 1977 of $4,585,439 (non-SRLY bank members) and taxable year 1981 of $268,839 (SRLY carryback).

C. <u>Petitioner's Position</u>

Petitioner contends that the method used both by UBC on the Form 1139 and respondent in the notice to determine the bad debt portion of the consolidated 1987 NOL is incorrect. Under the method asserted by petitioner, the bad debt portion of the consolidated NOL is equal to the excess of the consolidated 1987 NOL over the consolidated 1987 NOL computed without the bad debt deductions of the bank members. Under that method, regardless of whether the consolidated 1987 NOL on the Form 1139 ($12,549,042) or in the notice ($9,239,383) is used, since the bad debt deductions of the bank members for 1987 total $61,296,286, elimination of such bad debt deductions from the consolidated 1987 NOL (i.e., the "without" calculation) would eliminate the consolidated 1987 NOL and result in substantial consolidated taxable income for the UBC consolidated group. Under those circumstances, there would be no consolidated 1987 NOL to be allocated among the loss members of the group. Thus, under the method asserted by petitioner, the entire amount of the consolidated 1987 NOL is attributable to bad debt deductions of bank members, and the entire portion of the consolidated 1987 NOL allocated to the loss bank members is subject to the 10-year carryback provisions of section 172(b)(1)(L).

D. <u>Discussion</u>

Consider a business with $100 of gross income, deductions other than bad debts of $80, and deductible bad debts of $30. The business has a NOL of $10. Under the general rule of section 172(b)(1)(A), the NOL may be carried back 3 years and carried over

15 years, and the constituent parts of the NOL are of no importance in determining the business's eligibility for such treatment. If the corporation were a commercial bank, however, then, because of section 172(b)(1)(L), the constituent parts of the NOL would be important, because the special period rules of section 172(l) apply only to that portion of the NOL attributable to the deduction allowed by section 166 (the bad debt portion). In theory, the bad debt portion of the NOL might be determined in a number of ways. A simple way would be to determine that, since the bad debt deduction of $30 accounted for approximately 27 percent of the total deductions of $110, 27 percent of the NOL, i.e., $2.70, is the bad debt portion. Section 172(l)(1) adopts a different rule, one that is favorable to the intended recipients, commercial banks. Under section 172(l)(1), on the facts of our simple example, if the corporation were a commercial bank, the bad debt portion is $10. The assumption is that deductions for (losses from) bad debts constitute the NOL to the extent of such deductions.

Neither party disagrees that section 172(l)(1) works as described. Their disagreement concerns the composition of the consolidated NOL. Respondent would allocate the consolidated NOL among the loss members of the UBC affiliated group in proportion to each loss member's share of the aggregate of all loss member's NOLs and would further allocate each bank loss member's share of the consolidated NOL between the bad debt portion of the bank member's NOL and the remainder of the bank loss member's NOL in proportion to those relative amounts. Thus, assume that affiliated group ABC,

making a consolidated return of income, had a consolidated NOL of $10, and each member had separate taxable incomes as follows:

| Member A | $100 |
|----------|------|
| Member B | (80) |
| Member C | (30) |

Further assume that Member C is a commercial bank, and is the only member that is a commercial bank, and that the bad debt portion of its NOL is $20. Respondent would apportion 73 percent of the consolidated NOL ($7.30) to Member B and 27 percent ($2.70) to Member C. Respondent would further determine that the bad debt portion of the consolidated NOL is $1.82 ($20 x ($10 ÷ $110)). Under petitioner's method: "[T]he bad debt portion of the consolidated NOL is equal to the excess of the consolidated NOL over the consolidated NOL computed without the bad debt deductions of the bank members." Thus, with respect to affiliated group ABC, petitioner would determine that the bad debt portion of the consolidated NOL is $20.

The difference between the parties is whether the special ordering rule of section 172(l)(1) should be applied to a consolidated NOL. The gist of petitioner's argument is that the consolidated return regulations provide that the consolidated NOL must be determined on a consolidated basis. Petitioner would, thus, analogize an affiliated group with both bank and nonbank loss members (and with a consolidated NOL) to a separate corporation with both bad debt and nonbad debt losses (and an NOL) and apply section 172(l)(1) to the consolidated NOL.

We find no basis in the consolidated return regulations for

petitioner's analogy. Although the consolidated return regulations do speak in terms of a "consolidated net operating loss", see sec. 1.1502-21(b)(1), Income Tax Regs., it is quite clear that the consolidated net operating loss is to be determined by taking into account the "separate" taxable income, including the separate NOL, of each member of the group. See secs. 1.1502-12, 1.1502-21(f), Income Tax Regs. The separately determined losses of each member of the affiliated group do not lose their distinct character (to the extent that such distinct character is important) upon consolidation. Cf. Amtel, Inc. v. United States, 31 Fed. Cl. 598, 600 (1994), ("a member of an affiliated group may have a separate net operating loss with independent significance for income tax purposes") affd. without published opinion 59 F.3d 181 (1995). Moreover, section 172(l)(1) is a special rule that prioritizes a bank's losses. Nothing in that section leads us to believe that Congress intended to give a priority to a bank member's bad debt losses as against a nonbank member's losses in the context of a consolidated return.

E.   Conclusion

As stated, we agree with respondent's determination of the appropriate method to determine the bad debt portion of the consolidated NOL.

Decisions will be entered

under Rule 155.

APPENDIX

*Grant Street*



1 UBC
Parking Garage

◄ *Sherman Street* ►



Enter

Vault
Building
(Underground)

1 UBC
1700 Lincoln

Motorbank I

Bridge

Bridge

◄ *Lincoln Street*

3 UBC
1740 Broadway

The Atrium

2 UBC
1700 Broadway

▲ *18th Avenue*

*17th Avenue* ▲

*Broadway* ►

Docket Nos. 26499-93, 3723-95, 3724-95 & 3725-95

Joint Exhibit 20-T

# Denver, Colorado



North